**Docket Nos. 14-16319(L), 14-16429**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

REALTEK SEMICONDUCTOR CORPORATION,
a Taiwanese Corporation,

*Plaintiff-Appellee,*

v.

LSI CORPORATION, a Delaware Corporation
and AGERE SYSTEMS LLC,

*Defendants-Appellants.*

*Appeal from a Decision of the United States District Court for the Northern District of California, No. 5:12-cv-03451-RMW · Honorable Ronald M. Whyte*

## EXCERPTS OF RECORD
## VOLUME I OF III – Pages 1 to 87

DAVID E. SIPIORA, ESQ.
KEVIN M. BELL, ESQ.
KILPATRICK TOWNSEND
& STOCKTON LLP
1400 Wewatta Street, Suite 210
Denver, Colorado 80202
(303) 571 4000 Telephone
(303) 571 4321 Facsimile

*Attorneys for Appellants,*
*LSI Corporation and Agere Systems LLC*

COUNSEL PRESS · (800) 3-APPEAL

PRINTED ON RECYCLED PAPER

 

# TABLE OF CONTENTS

| Docket Entry | Description | Page |
|---|---|---|
| | **VOLUME I OF III – Pages 1 to 87** | |
| 389 | Order Granting Defendants LSI Corporation and Agere Systems LLC's Motion to Stay Enforcement of Judgment Pending Appeal, Filed August 11, 2014 | 1 |
| 365 | Final Judgment, Filed June 16, 2014 | 3 |
| 364 | Order Denying Permanent Injunction and Granting Declaratory Relief, Filed June 16, 2014 | 5 |
| 362 | Order Denying Motions for Judgment as a Matter of Law, Filed June 16, 2014 | 17 |
| 323 | Final Jury Instructions, Filed February 25, 2014 | 28 |
| 261 | Order re Pretrial Evidentiary Objections, Filed February 7, 2014 | 55 |
| 222 | Rulings on Motions *In Limine* and *Daubert* Motions, Filed January 6, 2014 | 57 |
| 102 | Order Granting Plaintiff Realtek Semiconductor Corporation's Motion for Partial Summary Judgment and Denying Defendants LSI Corporation and Agere Systems LLC's Motion to Stay, Filed May 20, 2013 | 73 |
| | **VOLUME II OF III – Pages 88 to 362 (FILED UNDER SEAL)** | |
| 379 | Defendants LSI Corporation and Agere Systems LLC's Notice of Appeal of Final Judgment, Filed July 11, 2014 | 88 |

| | | |
|---|---|---|
| 384 | Plaintiff Realtek Semiconductor Corporation's Notice of Cross-Appeal, Filed July 24, 2014 | 92 |
| 342 | Defendants LSI Corporation and Agere Systems LLC's Opposition to Plaintiff Realtek Semiconductor Corporation's Motion for Equitable Relief, Filed April 11, 2014 | 96 |
| 335 | Defendants LSI Corporation and Agere Systems LLC's Notice of and Renewed Motion for Judgment as a Matter of Law regarding Damages for Breach of Contract Pursuant to FRCP 50(b), Filed March 28, 2014 | 129 |
| 334 | Memorandum Order on Preliminary Injunction Appeal, Filed March 20, 2014 | 223 |
| 324 | Jury Verdict, Filed February 26, 2014 | 231 |
| 309 | Realtek's Objections to Jury Instructions, Filed February 24, 2014 | 233 |
| 280 | Defendants LSI Corporation and Agere Systems LLC's Motion Pursuant to FRCP 50(a) for Judgment as a Matter of Law re Damages for Breach of Contract and Response to Court Question re the Burden of Proof re Damages, Filed February 18, 2014 | 237 |
| 179 | Plaintiff Realtek Semiconductor Corporation's Amended Daubert Motion and Motions *In Limine*, Filed October 3, 2013 | 243 |
| 78 | Declaration of Charles A. Pannell, III in Support of Defendant LSI Corporation's and Agere Systems, LLC's Rule 56(d) Motion in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Pannell Decl."), Filed April 9, 2013 | 275 |
| | Pannell Decl., Exh. 2, Plaintiff Realtek Semiconductor Corporation's Supplemental Response to Defendant LSI Corporation's First Set of Interrogatories (Nos. 1-19) | 281 |

| | | |
|---|---|---|
| | Pannell Decl., Exh. 4, Realtek Semiconductor Corporation's Response to the Amended Complaint and Notice of Investigation (ITC No. 337-TA-837) | 314 |
| | Pannell Decl., Exh. 5, 6/20/2012 Email from Phillips to Baik | 345 |
| | Decl., Exh. 7, Plaintiff Realtek Semiconductor Corporation's Amended Response to Defendant LSI Corporation's Requests for Admission (Set One) | 355 |

**VOLUME III OF III – Pages 363 to 656**
**(FILED UNDER SEAL)**

| | | |
|---|---|---|
| 77 | LSI Corporation and Agere Systems LLC's Opposition to Plaintiff's Motion for Partial Summary Judgment and Request for a Rule 56(d) Continuance, Filed April 9, 2013 | 363 |
| 67 | Plaintiff Realtek Semiconductor Corporation's Motion for Partial Summary Judgment, Filed March 26, 2013 | 387 |
| | Declaration of Kames A. Daire in Support of Plaintiff Realtek Semiconductor Corporation's Motion for Partial Summary Judgment ("Daire Decl."), | 415 |
| | Daire Decl., Exh. F, 2002/2003 Letters | 456 |
| | Daire Decl., Exh. I, 3/7/2012 Letter from Waskiewicz to Realtek | 473 |
| | Daire Decl., Exh. M, 5/24/2012 Letter from Baik to Waskiewicz | 476 |
| | Decl., Exh. N, 6/20/2012 Proposal | 478 |
| 68 | Request for Judicial Notice in Support of Plaintiff Realtek Semiconductor Corporation's Motion for Partial Summary Judgment ("RJN"), Filed March 26, 2013 | 493 |
| | RJN, Exh. A, Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments | 495 |
| | RJN, Exh. B, Opening Remarks of Federal Trade Commission Chairman Jon Leibowitz as Prepared for Delivery | 506 |

| | | |
|---|---|---|
| | RJN, Exh. C, Decision and Order, In the Matter of Motorola Mobility LLC and Google Inc. | 513 |
| 44 | LSI Corporation and Agere Systems LLC's Answer to Original Complaint and Counterclaims, Filed October 24, 2012 | 543 |
| 41 | Order Granting in Part and Denying in Part Motion to Dismiss, Filed October 10, 2012 | 560 |
| 1 | Original Complaint, Demand for Jury Trial, Filed June 29, 2012 | 570 |
| 273 | Trial Transcript, Realtek Semiconductor Corporation v. LSI Corporation and Agere Systems LLC, Date of Proceedings: February 10, 2014 | 592 |
| 274 | Trial Transcript, Realtek Semiconductor Corporation v. LSI Corporation and Agere Systems LLC, Date of Proceedings: February 11, 2014 | 599 |
| 306 | Trial Transcript, Realtek Semiconductor Corporation v. LSI Corporation and Agere Systems LLC, Date of Proceedings: February 18, 2014 | 603 |
| 316 | Trial Transcript, Realtek Semiconductor Corporation v. LSI Corporation and Agere Systems LLC, Date of Proceedings: February 24, 2014 | 608 |
| | Deposition Transcript of Warren K. Waskiewicz, Taken on January 31, 2013 | 613 |
| | Hearing Transcript, Date of Proceedings: May 9, 2014 | 616 |
| | Docket Report | 620 |

KILPATRICK TOWNSEND & STOCKTON LLP
DAVID E. SIPIORA (SBN 124951)
KEVIN M. BELL (*Admitted Pro Hac Vice*)
KENT T. DALLOW (*Admitted Pro Hac Vice*)
1400 Wewatta Street, Suite 600
Denver, CO 80202-5556
Telephone: (303) 571-4000
Facsimile: (303) 571-4321
Email: *dsipiora@kilpatricktownsend.com*
*kbell@kilpatricktownsend.com*
*kdallow@kilpatricktownsend.com*

KILPATRICK TOWNSEND & STOCKTON LLP
ROBERT J. ARTUZ (State Bar No. 227789)
1080 Marsh Road
Menlo Park, CA 94025
Telephone: (650) 326-2400
Facsimile: (650) 326-2422
Email: *rartuz@kilpatricktownsend.com*

Attorneys for Defendants
LSI CORPORATION and AGERE SYSTEMS LLC

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

REALTEK SEMICONDUCTOR CORPORATION,

Plaintiff,

v.

LSI CORPORATION, et al.,

Defendants.

Case No. C 12-03451 RMW

**~~[PROPOSED]~~ ORDER GRANTING DEFENDANTS LSI CORPORATION AND AGERE SYSTEMS LLC'S MOTION TO STAY ENFORCEMENT OF JUDGMENT PENDING APPEAL**

Before the Court is Defendants LSI Corporation and Agere Systems LLC's Motion to Stay Enforcement of Judgment Pending Appeal pursuant to Fed. R. Civ. P. 62(d). Upon consideration of Defendants' Motion, the Opposition thereto, if any, and the entire record herein,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that

1. Defendants' supersedeas bond in the amount of $4,500,000 is approved; and

2. The Court hereby stays execution of the judgment in this matter under Fed. R. Civ.



Case: 14-16319, 12/04/2014, ID: 9340388, DktEntry: 16, Page 7 of 92
Case5:12-cv-03451-RMW Document98 Filed08/11/14 Page2 of 2

P. 62(d) pending final resolution of Defendants' appeal to the United States Court of Appeals for the Ninth Circuit.

**IT IS SO ORDERED.**

DATED: August 11, 2014

Ronald M. Whyte
Honorable Ronald M. Whyte
United Stated District Judge

~~[PROPOSED]~~ ORDER GRANTING DEFENDANTS' MOTION TO STAY ENFORCEMENT OF JUDGMENT PENDING APPEAL
CASE NO. C 12-03451 RMW

2

ER-0002

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

REALTEK SEMICONDUCTOR, CORPORATION,

Plaintiff,

v.

LSI CORPORATION AND AGERE SYSTEMS LLC,

Defendants.

Case No. C-12-3451-RMW

**FINAL JUDGMENT**

It is ordered, adjudged, and decreed that final judgment be entered in favor of plaintiff Realtek Semiconductor Corporation and against defendants LSI Corporation and Agere Systems LLC as follows:

1. Defendants shall pay to Realtek the amount of $3,825,000 (plus any associated post-judgment interest) as contractual damages incurred through July 31, 2013, consistent with the jury's special verdict.
2. The court hereby enters declaratory judgment that, upon Realtek's request for a license, to be in compliance with its RAND commitment, LSI must offer Realtek a license to the '958 Patent on RAND terms, including a royalty rate of 0.12% on the total United States sales of Realtek's accused products.

United States District Court
For the Northern District of California

3. The court hereby enters declaratory judgment that, upon Realtek's request for a license, to be in compliance with its RAND commitment, LSI must offer Realtek a license to the '867 Patent on RAND terms, including a royalty rate of 0.07% on the total United States sales of Realtek's accused products.

4. Realtek is the prevailing party for purposes of Federal Rule of Civil Procedure 54(d). Realtek may serve and file a bill of costs incurred in this action in accordance with Federal Rule of Civil Procedure 54(d) and Civil Local Rule 54.

**IT IS SO ORDERED.**

Dated: June 16, 2014

RONALD M. WHYTE
United States District Judge

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

REALTEK SEMICONDUCTOR, CORPORATION,

Plaintiff,

v.

LSI CORPORATION AND AGERE SYSTEMS LLC,

Defendants.

Case No. C-12-3451-RMW

**ORDER DENYING PERMANENT INJUNCTION AND GRANTING DECLARATORY RELIEF**

**[Re: Dkt. No. 337]**

Plaintiff Realtek Semiconductor Corporation ("Realtek") moves for a permanent injunction and declaratory relief against defendants LSI Corporation ("LSI") and Agere Systems LLC ("Agere") (collectively, "LSI" or "defendants"). For the reasons explained below, the court DENIES Realtek's motion for a permanent injunction and GRANTS Realtek's request for declaratory relief.

## I. BACKGROUND

Defendant Agere owns two patents, U.S. Patents Nos. 6,452,958 ("'958 Patent") and 6,707,867 ("'867 Patent"), that it designated as essential to the Institute of Electronic Engineers' ("IEEE") standard for wireless internet connectivity known as "WLAN," "Wi-Fi" or "802.11" (the

"802.11 standard").[1] In 2001, Agere is a wholly owned subsidiary of LSI. Realtek is a Taiwanese company which designs and supplies integrated circuits, including integrated circuits for WLAN technology. Prior to the release of the 802.11 protocols at issue, in 2003 and 2004, Agere submitted Letters of Assurance, as required by the IEEE Standards Board Bylaws, stating with respect to the '958 Patent and the pending application for the '867 Patent that it "is prepared to grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to comply with the [Proposed] IEEE Standard." Attachment to Complaint, Dkt. No. 1-2 Dkt. No. 67-6 ("Letters of Assurance") (alteration in original).

**A. The correspondence and ITC dispute**

On March 7, 2012, several years after the release of the 802.11 protocols, a representative of LSI contacted Realtek and asserted that Realtek products, as incorporated into certain third-party devices, infringe, *inter alia*, the '958 and '867 Patents. LSI's March letter did not offer a license, but demanded Realtek to immediately cease and desist from its allegedly infringing activities. Less than one week later, on March 12, 2012, LSI filed a complaint with the ITC naming Realtek and others as respondents and alleging, *inter alia*, that Realtek infringed the '958 and '867 Patents. LSI sought: (1) a "limited exclusion order" excluding the accused products from entry into the United States, and (2) "permanent cease-and-desist orders" barring Realtek from, *inter alia*, importing the accused products into the United States. On May 24, 2012, after LSI instigated the ITC proceeding, Realtek requested that LSI make the '958 and '867 Patents available for a reasonable and non-discriminatory ("RAND") license pursuant to defendant's designation of these patents as essential to the IEEE 802.11 standard and their promise in the Letters of Assurance.

**B. Procedural History**

On June 29, 2012, Realtek filed the instant action asserting that defendants breached their RAND licensing obligations by initiating an ITC Section 337 action naming Realtek as a respondent before approaching Realtek with a RAND licensing offer. Dkt. No. 1, Complaint. In its complaint, Realtek requested an injunction preventing LSI from enforcing its standard essential patents against Realtek without offering a RAND license, a declaration of RAND rates for the '958 and '867

[1] For a more detailed description of the history of the 802.11 standard, see the court's Order Granting in Part and Denying in Part Motion to Dismiss at 2, Dkt. No. 41.

United States District Court
For the Northern District of California

Patents, and a declaration that the ’958 and ’867 Patents are unenforceable as to Realtek if LSI fails to offer Realtek a RAND-complaint license. *See* Complaint at 15.

On May 20, 2013, this court granted partial summary judgment in favor of Realtek on its breach of contract claim and granted a conditional preliminary injunction preventing LSI from enforcing any exclusion order or injunctive relief with respect to the IEEE 802.11 standard-essential patents should the ITC grant said relief in the action before it. Dkt. No. 102, Order Granting Motion for Partial Summary Judgment. LSI appealed the court’s grant of the preliminary injunction. Dkt. No. 108. In its order granting partial summary judgment, this court held that LSI breached its RAND licensing obligations to Realtek by failing to offer a license to the standard essential ’958 and ’867 Patents before filing a Section 337 action at the ITC.

Beginning February 10, 2014, the court held an eleven day jury trial to determine the amount of Realtek’s breach of contract damages and RAND rates for the ’958 and ’867 Patents. The jury awarded $3,825,000 in damages to Realtek for LSI’s breach of contract and found RAND royalty rates of 0.12% for the ’958 Patent and 0.07% for the ’867 Patent. On March 4, 2014, the ITC issued its final determination in the underlying infringement dispute between Realtek and LSI. The ITC dismissed the ’867 Patent because it had expired on February 23, 2014, rendering the ITC investigation moot as to the ’867 Patent, given that the ITC can only issue prospective relief. Dkt. No. 327-1, ITC Final Determination, at 3. As to the ’958 Patent, the ITC determined that the ’958 Patent is invalid, not infringed by Realtek, and that no domestic industry existed as to the ’958 Patent (the existence of a domestic industry is an additional requirement for relief in the ITC). *Id*. Further, on March 20, 2014, the Ninth Circuit dismissed LSI’s appeal of this court’s grant of the preliminary injunction, finding the appeal mooted by the ITC’s refusal to issue an exclusion order, as the preliminary injunction was only operative if the ITC were to issue an exclusion order. Dkt. No. 334.

Realtek now moves for equitable relief in the form of a permanent injunction and declaratory judgment. Dkt. No. 337. LSI filed an opposition, Dkt. No. 342, and Realtek filed a reply, Dkt. No. 356. The court held a hearing on May 9, 2014.

**C. Requested Equitable Relief**

Realtek requests broad injunctive and declaratory relief against LSI. Specifically, Realtek moves for a permanent injunction enjoining LSI from:

> (a) further demanding royalties from Realtek as to U.S. Patent Nos. 6,452,958 (the "'958 patent") and 6,707,867 (the "'867 patent") that are not consistent with Defendants' reasonable and non-discriminatory ("RAND") obligations as reflected in the jury's February 26, 2014 verdict [as amended, if at all, by any subsequent judgment entered by the Court]; and
>
> (b) enforcing, or seeking to enforce, any of Defendants' alleged standard essential patents in the International Trade Commission or any other judicial forum without first offering Realtek a license consistent with Defendants' RAND obligations.

Dkt. No. 337-8, Proposed Order.

Realtek also moves for a declaratory judgment stating:

> if Defendants, including their officers, directors, agents, assignees, employees and attorneys, and all those in active concert or participation with them, fail to offer Realtek an ongoing license on RAND terms and conditions, consistent with the jury's February 26, 2014 verdict [as amended, if at all, by any subsequent judgment entered by the Court], the '958 and '867 patents are unenforceable as to Realtek and its products.

*Id*.

## II. LEGAL STANDARD

**A. Permanent Injunction**

"To obtain permanent injunctive relief, a plaintiff must show (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. . . . In determining the scope of an injunction, a district court has broad latitude, and it must balance the equities between the parties and give due regard to the public interest." *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1019 (9th Cir. 2009).

**B. Declaratory Relief**

"The decision to grant declaratory relief is a matter of discretion." *United States v. State of Wash.*, 759 F.2d 1353, 1356 (9th Cir. 1985). For any actual controversy within its jurisdiction, a

court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. "Declaratory relief should be denied when it will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties." *United States v. State of Wash.*, 759 F.2d 1353, 1357 (9th Cir. 1985). However, "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57. "Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201.

## III. ANALYSIS

### A. Permanent Injunction

LSI only contests the irreparable harm prong of the permanent injunction analysis. LSI's first argument on irreparable harm, which the court finds persuasive, is that the ITC's Final Determination of no domestic industry, invalidity, and no infringement extinguishes the likelihood of immediate irreparable harm.

"The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). In exercising its equitable discretion in this particular case, the court also has guidance from the Ninth Circuit. The Ninth Circuit dismissed LSI's appeal of this court's grant of a preliminary injunction as moot after the ITC issued its Final Determination, finding no domestic industry, invalidity, and no infringement. The Ninth Circuit's decision was based on the strict language of this court's preliminary injunction "that the injunction would go into effect only if the ITC granted an exclusion order." Dkt. No. 334, Ninth Circuit Preliminary Injunction Opinion, at 2. The panel explicitly did not consider whether the possibility of LSI winning an appeal of the ITC's decision at the Federal Circuit prevents the injunction issue from becoming moot. *Id.* ("Both parties argue that the appeal is not moot as LSI may still appeal the ITC's decision to the Federal Circuit. We need not consider that question as the preliminary injunction itself is no longer operative by virtue of the initial decision of the ITC that there was no Section 337 violation."). However, Judge Tashima in his concurrence addressed the effect LSI's appeal to the Federal Circuit would have on the availability

of a preliminary injunction: "If the Federal Circuit reverses the ITC's Notice of Final Determination and Termination of the Investigation in *In re Certain Audiovisual Components and Products Containing the Same*, Inv. No. 337-TA-837 (Mar. 4, 2014), and this case is then still in active litigation or on appeal, either party may then move for injunctive relief *pendente lite* based on those new circumstances." *Id*. at 3 (Tashima, J., concurring).

LSI argues that Judge Tashima's concurrence states that "the possibility of an exclusion order is presently extinguished, and if the Federal Circuit were to reverse and remand to the ITC (re-raising the threat of an exclusion order), then and only then could Realtek *seek* injunctive relief." Dkt. No. 342, LSI Opp., at 8. The court interprets Judge Tashima's concurrence more narrowly than LSI suggests. By its own terms, Judge Tashima's concurrence is directed only at "injunctive relief *pendente lite*" if this case is "still in active litigation or on appeal"—in other words, Judge Tashima's concurrence only addresses Realtek's ability to move for another preliminary injunction if the Federal Circuit reverses the ITC's findings while this case is still pending. The opinion says nothing about how the procedural posture of the ITC case affects the irreparable harm analysis under the instant motion for a permanent injunction.

Even so, the court finds that the ITC's Final Determination holding that LSI did not prove patent infringement for three independent reasons renders irreparable harm sufficiently speculative to deny Realtek's request for a permanent injunction at this time. According to Ninth Circuit law, if Realtek has not yet suffered irreparable harm, there must be a likelihood that substantial irreparable harm will be "immediate" in the absence of injunctive relief. *See G.C. & K.B. Invs., Inc. v. Wilson*, 326 F.3d 1096, 1107 (9th Cir. 2003). Realtek cannot meet this standard. Any possible exclusion order would not issue for some time. Further, several events must align in LSI's favor for the entry of an exclusion order to occur: (1) the Federal Circuit must reverse the ITC on three separate issues, (2) the ITC must make the further findings necessary for entry of an exclusion order, and (3) any exclusion order must survive a possible presidential veto. At this time, the possibility of an exclusion order is so speculative that the court cannot find that irreparable harm is "likely" or "immediate," as required under Ninth Circuit law. *Id*. Therefore, because "[i]rreparable harm is an essential prerequisite for a grant of injunctive relief," *Ross-Simons of Warwick, Inc. v. Baccarat,*

*Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) (affirming the issuance of a permanent injunction); *Midwest Growers Coop. Corp. v. Kirkemo*, 533 F.2d 455, 465-66 (9th Cir. 1976) (concluding that a permanent injunction was improperly issued because the plaintiff had "failed to show either irreparable harm or lack of any adequate remedy at law-both prerequisites to injunctive relief"), the court denies Realtek's motion for a permanent injunction.

The court concludes by recognizing that the ITC could still potentially issue an exclusion order in the future. As such, the court's denial of Realtek's motion is without prejudice to Realtek later bringing a motion for a permanent injunction should the threat of an exclusion order become more immediate.

**B. Declaratory Relief**

Realtek proposes declaratory relief that would prohibit LSI from enforcing the '958 and '867 Patents prior to offering Realtek a license consistent with LSI's RAND obligations. Dkt. No. 337-8. However, the court finds that such a request is better handled under Realtek's motion for a permanent injunction. "Actions for declaratory judgments are neither legal nor equitable, and courts have therefore had to look to the kind of action that would have been brought had Congress not provided the declaratory judgment remedy." *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 284 (1988). Here, for two reasons, the declaratory judgment remedy Realtek seeks is essentially a permanent injunction for which the standard four elements necessary for a permanent injunction must be shown. First, a declaration of unenforceability as to only Realtek would be largely duplicative of a permanent injunction prohibiting LSI from seeking an exclusion order before offering Realtek a RAND license. Second, like a typical injunction, the declaration Realtek proposes would functionally require LSI to forbear from a specific action: enforcing its patent rights as to Realtek. This declaration would attach primarily to the party rather than the patents. In this way, the declaratory remedy Realtek seeks is distinct from, for example, a declaration of a patent's unenforceability due to inequitable conduct, which attaches to the patent rather than the party. Consequently, the court analyzes Realtek's specific request for declaratory relief as a part of its motion for a permanent injunction and, as the court has already determined above, denies the specific relief Realtek seeks.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Still, the grant of declaratory relief is a matter firmly within the court's discretion. *See Green v. Mansour*, 474 U.S. 64, 72, 106 S. Ct. 423, 428, 88 L. Ed. 2d 371 (1985) ("the declaratory judgment statute 'is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant.'") (quoting *Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 241 (1952)); *Pub. Serv. Comm'n of Utah*, 344 U.S. at 241 ("It is a matter of discretion with federal courts."). The court, while rejecting Realtek's proposed declaratory relief, is free to craft its own appropriate declaratory judgment. Therefore, the court now turns to determining the proper scope of Realtek's declaratory relief.

The court can only enter declaratory judgment to the extent of its jurisdiction. 28 U.S.C. § 2201. Courts have jurisdiction under the Declaratory Judgment Act to determine the rights and legal relations of parties to a contract, so long as the case-or-controversy requirement is satisfied. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126, 137 (2007). Realtek's claim for declaratory relief flows from the RAND contract. The court has found that LSI breached its RAND obligations to Realtek when it sought an exclusion order at the ITC before offering Realtek a license on RAND terms. Dkt. No. 102. At that time, because an actual controversy existed between the parties over the royalty rate for a RAND-compliant license, the court had declaratory judgment jurisdiction over the determination of a RAND rate. As the court held in an order on LSI's motion to dismiss, "once the patentee interposes the threat of an injunction, the standard implementer is placed at a bargaining disadvantage in private negotiations such that the determination of a true RAND rate almost necessarily must be conducted by a court." Dkt. No. 41, at 7-8. Therefore, the court has jurisdiction to declare the parties' respective rights under the RAND contract, a foundational basis for declaratory judgment jurisdiction under the Declaratory Judgment Act. *See, e.g.*, *MedImmune*, 549 U.S. at 126-27.

This court has previously discussed the *Microsoft v. Motorola* case, a similar case which dismissed the declaratory judgment claims as duplicative of the breach of contract claim. Dkt. No. 41, at 8-9; *see Microsoft Corp. v. Motorola, Inc.*, No. 10-1823 JLR, 2011 WL 11480223, at *5-6 (W.D. Wash. June 1, 2011). In *Microsoft v. Motorola*, the court held that a determination of RAND royalty rates was necessary to establish whether Motorola had breached its RAND commitments.

*Microsoft v. Motorola*, 2011 WL 11480223, at *5-6. By contrast, in this case LSI had not offered Realtek a license before instituting the ITC suit, so a determination of RAND royalty rates was not necessary to establish whether LSI had breached its RAND commitments. Dkt. No. 102, Order Granting Partial Summary Judgment, at 11. This means that the declaratory judgment claims are not duplicative of the breach of contract claim. Therefore, an actual controversy remains between the parties as to their rights under the RAND contracts—the parties dispute what royalty rates are consistent RAND-compliant. Consequently, entering final judgment on only Realtek's breach of contract claim would not resolve the parties' controversy over the RAND royalty rates.

A further complication exists as to the '867 Patent because the '867 Patent expired on February 23, 2014. The parties dispute whether the court continues to have jurisdiction to determine a RAND royalty rate for the '867 Patent now that the '867 Patent has expired. The court holds that its jurisdiction to determine a RAND royalty rate for the '867 Patent continues so long as an actual case or controversy is present over the RAND royalty rate for the '867 Patent. Here, there is such a case or controversy because Realtek has reasonable apprehension of LSI bringing suit for past infringement of the '867 Patent, thereby implicating LSI's RAND obligations. *See Arkema Inc. v. Honeywell Int'l, Inc.*, 706 F.3d 1351, 1360 n.5 (Fed. Cir. 2013) ("While a declaratory judgment plaintiff is no longer required to demonstrate a reasonable apprehension of suit, such a showing remains sufficient to establish jurisdiction.") (citing *MedImmune*, 549 U.S. at 132 n. 11; *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1380 (Fed. Cir. 2007); *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1282 (Fed. Cir. 2012)).

"An 'actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" *Alvarez v. Smith*, 558 U.S. 87, 92 (2009) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975); *Steffel v. Thompson*, 415 U.S. 452, 459, n. 10 (1974)). As outlined above, the actual controversy for the purposes of declaratory judgment jurisdiction has always centered on declaring the parties' rights under the RAND contract. The RAND commitment requires LSI to offer Realtek a RAND royalty rate for declared standard essential patents if Realtek wants a license. Now that the '867 Patent has expired, the court only has declaratory judgment jurisdiction if (1) the court would have declaratory judgment jurisdiction over an infringement suit based on the '867

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Patent, and (2) that infringement suit requires interpreting the parties' rights under the RAND contract. The court takes each condition in turn.

To qualify as an actual case or controversy within the court's Article III jurisdiction, a dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune*, 549 U.S. at 127. "In patent cases, declaratory judgment jurisdiction exists where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license." *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1361 (Fed. Cir. 2009). In this case, it is clear that both parties contemplate an infringement suit based on the '867 Patent, and that, at least at one time or another, each party has viewed this case as resolving important issues for a following infringement suit. Realtek's current position is that the court should enter declaratory judgment of the RAND royalty rate for the '867 Patent so that the parties can calculate damages in a possible infringement suit. Although LSI's position has since changed, LSI originally proposed that the jury be asked to award a lump sum of damages for past alleged infringement of the '867 Patent. *See, e.g.*, Dkt. No. 171, LSI Proposed Verdict Form, at 1. Furthermore, LSI has sued Realtek for infringement of the '867 Patent in the ITC, and the parties represented at the hearing on the instant motion that LSI maintains another case for infringement of the '867 Patent against Funai, one of Realtek's customers, in the Central District of California. In light of all these facts indicating that an infringement suit continues to loom over this case, LSI's arguments that no case or controversy exists because LSI has not named Realtek in the Central District of California Funai case or because LSI did not counterclaim for infringement here ring hollow. The likelihood that LSI might sue Realtek for past infringement of the '867 Patent has been an aspect of this case all along, and the parties' dispute over the RAND royalty rate for the '867 Patent here directly implicates the issues in that patent infringement controversy.

In a suit for patent infringement, damages are those "adequate to compensate for the infringement, but in no event less than a reasonable royalty." 35 U.S.C. § 284. As the RAND

Case: 14-16319, 12/04/2015, ID: 9780348, DktEntry: 16, Page 20 of 92

commitment obligates the patent holder to licensing the patent on RAND terms, the two previous cases involving patents subject to RAND commitments calculated damages based on a reasonable royalty. *See Microsoft Corp. v. Motorola, Inc.*, No. 10-1823 JLR, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013); *In re Innovatio IP Ventures, LLC Patent Litig.*, MDL 2303, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013). Courts, including the *Microsoft* and *Innovatio* courts, commonly employ a hypothetical negotiation framework to establish the amount of a reasonable royalty. The hypothetical negotiation framework "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

In the RAND context, determining damages for patent infringement is equivalent to declaring the parties' rights under the RAND contract. The court here was tasked with declaring the parties' rights under the RAND contract, but it drew from case law on patent infringement damages for its methodology. In its instructions to the jury, the court applied the hypothetical negotiation framework to instruct the jury on arriving at an appropriate RAND royalty rate. While this court altered some of the details of the *Microsoft* and *Innovatio* framework, it followed the same general approach. The reasonable royalty methodology in a patent infringement suit between Realtek and LSI would be identical to the methodology given to the jury to declare the parties' rights under the RAND contract. Therefore, even though the patent has expired, the RAND commitment would still inform the hypothetical negotiation over a reasonable royalty, so the court retains jurisdiction to declare the parties' rights under that commitment.

Accordingly, the court will therefore enter the following declaratory judgment relief in its final judgment: "The court hereby enters declaratory judgment that, upon Realtek's request for a license, to be in compliance with its RAND commitment, LSI must offer Realtek a license to the '958 Patent on RAND terms, including a royalty rate of 0.12% on the total sales of Realtek's products. The court hereby enters declaratory judgment that, upon Realtek's request for a license, to be in compliance with its RAND commitment, LSI must offer Realtek a license to the '867 Patent

United States District Court
For the Northern District of California

on RAND terms, including a royalty rate of 0.07% on the total United States sales of Realtek's accused products."[2]

## IV. ORDER

For the foregoing reasons, the court DENIES Realtek's motion for a permanent injunction without prejudice and GRANTS Realtek's motion for declaratory relief. Final judgment will be entered consistent with this order.

**IT IS SO ORDERED.**

Dated: June 16, 2014

RONALD M. WHYTE
United States District Judge

[2] Note the minor correction of the initial order here. *See* Dkt. No. 363.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

REALTEK SEMICONDUCTOR, CORPORATION,

Plaintiff,

v.

LSI CORPORATION AND AGERE SYSTEMS LLC,

Defendants.

Case No. C-12-3451-RMW

**ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW**

**[Re: Dkt. No. 335, 338]**

Following the jury verdict in an eleven day trial, plaintiff Realtek Semiconductor Corporation ("Realtek") and defendants LSI Corporation ("LSI") and Agere Systems LLC ("Agere") (collectively, "LSI" or "defendants") each move for judgment as a matter of law on various issues. For the reasons explained below, the court DENIES the parties' motions for judgment as a matter of law.

## I. BACKGROUND

Defendant Agere owns two patents, U.S. Patents Nos. 6,452,958 ("'958 Patent") and 6,707,867 ("'867 Patent"), that it designated as essential to the Institute of Electronic Engineers' ("IEEE") standard for wireless internet connectivity known as "WLAN," "Wi-Fi" or "802.11" (the

"802.11 standard").[1] In 2001, Agere became a wholly owned subsidiary of LSI. Realtek is a Taiwanese company which designs and supplies integrated circuits, including integrated circuits for WLAN technology. Prior to the release of the 802.11 protocols at issue, in 2003 and 2004, Agere submitted Letters of Assurance, as required by the IEEE Standards Board Bylaws, stating with respect to the '958 Patent and the pending application which led to the '867 Patent that it "is prepared to grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to comply with the [Proposed] IEEE Standard." Attachment to Complaint Dkt. No. 1-2 ("Letters of Assurance") (alteration in original).

**A. The correspondence and ITC dispute**

On March 7, 2012, several years after the release of the 802.11 protocols, a representative of LSI contacted Realtek and asserted that Realtek products, as incorporated into certain third-party devices, infringe, *inter alia*, the '958 and '867 Patents. LSI's March letter did not offer a license, but demanded Realtek to immediately cease and desist from its allegedly infringing activities. Less than one week later, on March 12, 2012, LSI filed a complaint with the ITC naming Realtek and others as respondents and alleging, *inter alia*, that Realtek infringed the '958 and '867 Patents. LSI sought: (1) a "limited exclusion order" excluding the accused products from entry into the United States, and (2) "permanent cease-and-desist orders" barring Realtek from, *inter alia*, importing the accused products into the United States. On May 24, 2012, Realtek requested that LSI make the '958 and '867 Patents available for a reasonable and non-discriminatory ("RAND") license pursuant to defendant's designation of these patents as essential to the IEEE 802.11 standard and their promise in the Letters of Assurance.

**B. Procedural History**

On June 29, 2012, Realtek filed the instant action asserting that defendants breached their RAND licensing obligations by initiating an ITC Section 337 action naming Realtek as a respondent before approaching Realtek with a RAND licensing offer. Dkt. No. 1, Complaint. In its complaint, Realtek requested an injunction preventing LSI from enforcing its standard essential patents against Realtek without offering a RAND license, a declaration of RAND rates for the '958 and '867

[1] For a more detailed description of the history of the 802.11 standard, see the court's Order Granting in Part and Denying in Part Motion to Dismiss at 2, Dkt. No. 41.

Patents, and a declaration that the ’958 and ’867 Patents are unenforceable as to Realtek if LSI fails to offer Realtek a RAND-complaint license. *See* Complaint at 15.

On May 20, 2013, this court granted partial summary judgment in favor of Realtek on its breach of contract claim and granted a conditional preliminary injunction preventing LSI from enforcing any exclusion order or injunctive relief with respect to the IEEE 802.11 standard-essential patents should the ITC grant said relief in the action before it. Dkt. No. 102, Order Granting Motion for Partial Summary Judgment. LSI appealed the court’s grant of the preliminary injunction. Dkt. No. 108. In its order granting partial summary judgment, this court held that LSI breached its RAND licensing obligations to Realtek by failing to offer a license to the standard essential ’958 and ’867 Patents before filing a Section 337 action at the ITC.

Beginning February 10, 2014, the court held an eleven day jury trial to determine the amount of Realtek’s breach of contract damages and RAND rates for the ’958 and ’867 Patents. The jury awarded $3,825,000 in damages to Realtek for LSI’s breach of contract and found RAND royalty rates of 0.12% for the ’958 Patent and 0.07% for the ’867 Patent. On March 4, 2014, the ITC issued its final determination in the underlying infringement dispute between Realtek and LSI. The ITC dismissed the ’867 Patent because it had expired on February 23, 2014, rendering the ITC investigation moot as to the ’867 Patent, given that the ITC can only issue prospective relief. Dkt. No. 327-1, ITC Final Determination, at 3. As to the ’958 Patent, the ITC determined that the ’958 Patent is invalid, not infringed by Realtek, and that no domestic industry existed as to the ’958 Patent (the existence of a domestic industry is an additional requirement for relief in the ITC). *Id*. Further, on March 20, 2014, the Ninth Circuit dismissed LSI’s appeal of this court’s grant of the preliminary injunction, finding the appeal mooted by the ITC’s refusal to issue an exclusion order, as the preliminary injunction was only operative if the ITC were to issue an exclusion order. Dkt. No. 334.

Realtek and LSI now each move for judgment as a matter of law. Dkt. No. 336-5, Realtek JMOL; Dkt. No. 335, LSI JMOL. Both parties filed oppositions, Dkt. No. 344-4, LSI Opp. to Realtek’s Motion; Dkt. No. 346, Realtek Opp. to LSI’s Motion, and replies, Dkt. No. 353-4, Realtek Reply, Dkt. No. 355, LSI Reply. The court held a hearing on May 9, 2014.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

## II. LEGAL STANDARD

"We review a jury's verdict for substantial evidence in ruling on a properly made motion under Rule 50(b)." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). "The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Barnard v. Theobald*, 721 F.3d 1069, 1075 (9th Cir. 2013) (quoting *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2005)). Judgment as a matter of law should be granted only where "there is no legally sufficient basis for a reasonable jury to find for that party on that issue." *Krechman v. Cnty. of Riverside*, 723 F.3d 1104, 1109-10 (9th Cir. 2013) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 917 (9th Cir. 2003)). "[T]he court 'may not substitute its view of evidence for that of the jury.'" *Id*. at 1110 (quoting *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001)).

## III. ANALYSIS

### A. Breach of Contract Damages

#### 1. Burden of proof

The parties dispute two issues: (1) given LSI's mitigation defense, which party bears the burden of proof on whether Realtek's damages are reasonable, and (2) whether Realtek must prove that it paid its invoices, or whether Realtek need only prove that it incurred and is obligated to pay the legal fees requested as damages. The court addresses each issue in turn.

As the court has previously explained, Realtek bears the initial burden of proving the extent of its injury. Realtek satisfies that burden by offering evidence of the amount of damages it incurred as a result of LSI's breach. Expenses Realtek actually incurred are presumed to be reasonable costs. *See Jackson v. Yarbray*, 179 Cal. App. 4th 75, 96 (2009) ("Testimony or properly admitted documentary evidence of the attorney fees incurred to defend a maliciously prosecuted action constitutes a prima facie case of that element of special damages. Absent contrary evidence, it must be assumed those fees were reasonable."). The burden then shifts to LSI to prove that Realtek failed to act reasonably in limiting its damages. *Id*. at 97 ("However, while the burden of proving the extent of injury, including attorney fees, actually incurred as a result of a defendant's tortious conduct lies with the plaintiff, the burden of proving the plaintiff failed to act reasonably in limiting

his or her consequential damages—that is, failed to mitigate damages—is on the defendant in a malicious prosecution action, as it is in any other tort action.").

LSI protests that the *Jackson* case is limited only to malicious prosecution actions. However, *Jackson* states a more general damages rule in the context of proving attorneys' fees as damages for malicious prosecution. As many California contract cases have stated, "[i]t is axiomatic that the burden of proof is on the party whose breach caused damage, to establish matters relied on to mitigate damage." *Healdsburg Police Officers Assn. v. City of Healdsburg*, 57 Cal. App. 3d 444, 456 (1976) (citing *Steelduct Co. v. Henger-Seltzer Co.*, 26 Cal. 2d 634, 654 (1945)). Moreover, "[p]lacing on the party who breaches the burden of showing that consequential losses could have been avoided is intuitively attractive, since proof that there has been a failure to mitigate adequately will reduce the damages awarded and, therefore, seems more in the nature of a defense than an element of the plaintiff's affirmative case." *Carnation Co. v. Olivet Egg Ranch*, 189 Cal. App. 3d 809, 817-18 (1986). Not only is this the law in standard breach of contract cases, but the *Jackson* rule also applies to breach of contract cases governed by the California Commercial Code. *See id*. at 818 ("while the burden of proving the extent of loss incurred by way of consequential damages rests with the injured party, section 2715(2)(a) imposes upon the allegedly breaching party the burden of proving the inadequacy of efforts to mitigate consequential damages."). In sum, then, the law is clear that although Realtek is only entitled to the reasonable expenses it incurred as a result of LSI's breach, the initial burden of proving the extent of the injury is on Realtek, and the burden of proving that Realtek failed to reasonably limit its damages is on LSI. To be entitled to recovery, Realtek need not offer any affirmative evidence that its damages were reasonable—it need only offer evidence showing the amount of consequential damages it sustained.

In addition, the parties dispute whether Realtek must prove that it paid its invoices, or whether Realtek need only prove that it incurred the legal fees requested as damages. The court has already ruled in Realtek's favor on this issue, and the court declines to reverse its previous holding that Realtek need only prove that it incurred the legal fees requested as damages. *See* Dkt. No. 346-3, Gill Decl., Ex. B at 1049:13-1050:1 ("the only evidence is that the bills were incurred and most of them have been paid to date. I think that's enough to show the damages."). "A basic principle of

contract law is that the purpose of contract damages is to put a plaintiff in the same economic position he or she would have occupied had the contract been fully performed." *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1029 (N.D. Cal. 2012). Adopting LSI's position that Realtek must have actually paid the legal fees it incurred before they are recoverable as damages would violate this basic principle because it would mean that a party unable to pay expenses it incurred through no fault of its own would not be able to recover from the breaching party. Tellingly, LSI does not cite a single case in support of its proposition that Realtek must prove that it actually paid its invoices. As such, the court holds, consistent with the verdict form language proposed by LSI, that Realtek need only prove the amount of damages it incurred as a result of LSI's breach. *See* Dkt. No. 346-5, Gill Decl., Ex. D at 11:11-17.

**2. Realtek's initial burden**

As described above, Realtek met its initial burden of proving its breach of contract damages by offering invoices showing the legal fees Realtek incurred in defending itself in the ITC action. However, numerous entries in Realtek's invoices were redacted, allegedly due to a joint defense group privilege that Realtek could not unilaterally waive. Still, Realtek is only entitled to the legal fees it can actually prove that it incurred in connection with defending itself in the ITC case. Realtek had several ways in which it could satisfy its initial burden of proving that the redacted entries were reasonable fees related to the ITC action. As just one example, Realtek could have called a Finnegan attorney to testify that the fees were incurred as a result of the ITC case. Instead, Realtek proffered invoices that redacted the subject matter of many entries, without providing any evidence demonstrating that the fees shown on the redacted entries were incurred as a result of LSI's breach of contract. Consequently, the jury could have relied on Ms. Sundeen's testimony that Realtek is not entitled to breach of contract damages with respect to the $853,582 Realtek claimed based on redacted invoice entries.

**3. LSI's burden on mitigation**

Realtek argues that it is entitled to all of its breach of contract damages as a matter of law because LSI did not offer sufficient evidence to prove that Realtek failed to mitigate its damages. LSI, in turn, contends that it is entitled to judgment as a matter of law that Realtek failed to mitigate

United States District Court
For the Northern District of California

its damages. The court finds that the jury's verdict is supported by sufficient evidence, and therefore denies both parties' motions for judgment as a matter of law.

The mitigation doctrine holds that "[a] plaintiff who suffers damage as a result of either a breach of contract or a tort has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided." *Shaffer v. Debbas*, 17 Cal. App. 4th 33, 41 (1993); *accord Seabord Music Co. v. Germano*, 24 Cal. App. 3d 618, 622-623 (1972). A plaintiff may not recover for damages avoidable through ordinary care and reasonable exertion. *Mayes v. Sturdy Northern Sales, Inc.*, 91 Cal. App 3d 69, 85 (1979). The duty to mitigate damages does not require an injured party to do what is unreasonable or impracticable. *Valencia v. Shell Oil Co.*, 23 Cal.2d 840, 846 (1944).

Significantly, as this court has previously held in this case, "[i]t is appropriate for courts to focus not on the failure of the plaintiff to pursue the alternative courses of action suggested by the defendant but upon the reasonableness of the action which the plaintiff did in fact take. The fact that in retrospect a reasonable alternative course of action is shown to have been feasible is not proof of the fact that the course actually pursued by the plaintiff was unreasonable." Dkt. No. 222, Rulings on Motions *in Limine* and *Daubert* Motions, at 12 (citing *Carlisle Ventures, Inc. v. Banco Espanol de Credito S.A.*, 176 F.3d 601, 609 (2d Cir. 1999)) (quoting *Zanker Development Co. v. Cogito Sys. Corp.*, 215 Cal. App. 3d 1377, 1381 (1989)) (ellipses and alterations omitted). Stated another way by a California court, "[i]f a choice of two reasonable courses presents itself, the person whose wrong forced the choice cannot complain that one rather than the other is chosen. The standard by which the reasonableness of the injured party's efforts is to be measured is not as high as the standard required in other areas of law. It is sufficient if he acts reasonably and with due diligence, in good faith." *Green v. Smith*, 261 Cal. App. 2d 392, 397 (1968).

LSI concedes that Realtek received a discount of at least five percent on its attorneys' fees from the law firm of Finnegan, Henderson, Farabow, Garrett & Dunner ("Finnegan"). However, LSI argued at trial that Realtek still failed to mitigate its damages for five main reasons: (1) Realtek did not secure a larger rate discount, (2) Realtek did not secure a rate freeze, (3) Realtek did not prevent Finnegan from billing for clerical work, (4) Realtek did not save enough in fees from the joint

**United States District Court**
For the Northern District of California

defense group, and (5) Realtek's total fees are unreasonable based on a survey by the American Intellectual Property Law Association ("AIPLA").

The jury was entitled to rely on Ms. Sundeen's testimony concerning joint defense group savings and the AIPLA survey in finding that Realtek failed to mitigate its damages. As to the joint defense group, Ms. Sundeen testified generally that based on her experience with joint defense groups, she "would have expected [Realtek's attorneys' fees] to be lower with the existence of a joint defense group." Dkt. No. 338-7, Daire Decl., Ex. 6 at 775:18-776:19. Realtek used a joint defense group in the ITC litigation, but, according to Ms. Sundeen, Realtek should have saved an additional 20-25% off of its legal fees due to the joint defense group. *Id*. Although Realtek is correct that Ms. Sundeen conceded that Realtek realized some savings from its use of a joint defense group, the jury could have agreed with Ms. Sundeen and found that the amount of Realtek's savings was inconsistent with reasonable use of a joint defense group. In concluding that Realtek acted unreasonably, the jury could have credited Ms. Sundeen's extensive experience with ITC litigation and the use of joint defense groups. *See* Dkt. No. 306 at 749:22-751:4 (detailing Ms. Sundeen's experience, including over 30 years in private practice and over 40 ITC investigations).

As to the AIPLA survey, Ms. Sundeen presented an AIPLA survey on the costs of litigating a case before the ITC. Ms. Sundeen assumed based on Realtek's direct United States sales data that Realtek would have been damaged no more than $30,000 from the issuance of an ITC order excluding Realtek's products from the United States market. *Id*. at 831:21-25; 834:7-10. Taking this potential exposure figure and the 75th percentile cost figure from the AIPLA survey, Ms. Sundeen concluded that Realtek's attorneys' fees should not have exceeded $2.5 million. In its motion for judgment as a matter of law, Realtek focuses on Ms. Sundeen's use of Realtek's direct United States sales data to determine the amount at risk in the ITC litigation. On cross-examination, Realtek attacked Ms. Sundeen's methodology at length, and Ms. Sundeen admitted that it was possible that Realtek's potential exposure was greater than $1 million. *Id*. at 834:24-25. Despite this cross-examination testimony, the jury still could have relied on Ms. Sundeen's use of Realtek's direct sales to determine its amount at risk in the ITC litigation. Moreover, even if the jury found that Realtek's potential exposure was greater than the $30,000 used by Ms. Sundeen, the jury could have

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

arrived at the conclusion that Realtek failed to mitigate its damages based on the AIPLA survey in any number of other ways. For example, the jury could have used the median litigation costs reported in the AIPLA survey instead of Ms. Sundeen's more conservative use of the 75th percentile. Therefore, the jury's conclusion that Realtek failed to mitigate its damages is supported by sufficient evidence. More broadly, the jury's award of breach of contract damages is supported by substantial evidence because the jury could have determined that Realtek did not meet its initial burden of proof of proving its damages as to the redacted invoices, and the jury could have credited Ms. Sundeen's testimony as to joint defense group savings and the AIPLA survey. Therefore, Realtek is not entitled to judgment as a matter of law.

Nor is LSI entitled to judgment as a matter of law that Realtek's breach of contract damages were $2.5 million. Realtek presented uncontested evidence at trial showing that Realtek received a 5% discount on its attorneys' fees. Moreover, LSI concedes that Realtek used a joint defense group, from which Realtek realized some savings. Realtek also contested Ms. Sundeen's methodology and credibility on cross-examination, including Ms. Sundeen's use of $30,000 as Realtek's total exposure in the ITC case. The jury could have reasonably found that one or all of these factors supported a damages verdict of more than the $2.5 million for which LSI advocated. Therefore, the court also denies LSI's motion for judgment as a matter of law.

**B. RAND Royalty Rates**

Realtek advances two arguments that it is entitled to judgment as a matter of law on the RAND royalty rates. First, Realtek asserts that the court should enter judgment as a matter of law that the '867 Patent has a royalty rate of zero. However, this issue relates to the scope of the court's declaratory judgment jurisdiction, which is addressed in the court's Order Denying Permanent Injunction and Granting Declaratory Relief. Judgment as a matter of law on the '867 Patent is improper because the jury's verdict determining a royalty rate for the '867 Patent is supported by substantial expert testimony and other evidence.

Second, Realtek contends that Dr. Layne-Farrar's estimation of the number of Agere standard essential patents was not supported by substantial evidence, and thus that LSI did not support its proffered royalty rates with sufficient evidence. Dr. Layne-Farrar, LSI's damages expert,

arrived at a damages figure by identifying an allegedly comparable license and dividing the license's royalty rate by the number of Agere patents alleged to be standard essential. To estimate the number of Agere standard essential patents, Dr. Layne-Farrar testified that she consulted with Mr. Warren Waskiewicz, LSI's Vice President of Intellectual Property and its corporate representative in this case. Realtek argued at trial, and again here, that Dr. Layne-Farrar greatly underestimated the number of standard essential Agere patents, artificially inflating the ultimate royalty rate for the '867 and '958 Patents. Specifically, Dr. Layne-Farrar testified that she learned just before trial that she mistakenly omitted five patents from the number of Agere standard essential patents. Then, on cross-examination, Realtek presented Dr. Layne-Farrar with an additional standard essential patent that Dr. Layne-Farrar did not include in her denominator for the purpose of apportioning the allegedly comparable license's royalty rate into a per-patent rate. In that line of questioning, Dr. Layne-Farrar admitted that she could increase her denominator by an additional patent. Dkt. No. 336-6, Daire Decl., Ex. 1 at 1323:24-1324:5. On redirect, Dr. Layne-Farrar testified that her initial estimate of the number of Agere standard essential patents could have been over-inclusive, such that the jury need not increase her denominator by an additional patent based on the patent Realtek presented on cross-examination. *Id.* at 1333:8-16. Relying on this testimony, Realtek argues that Dr. Layne-Farrar's denominator was so arbitrary that the jury could not credit it in determining a RAND royalty rate for the '867 and '958 Patents. Realtek therefore requests that the court grant judgment as a matter of law and enter its proffered royalty rate for the two patents.

LSI presented sufficient evidence to support the jury's verdict finding RAND royalty rates for the '867 and '958 Patents. Even had the jury credited every argument Realtek made that caused Dr. Layne-Farrar to adjust her royalty rate, the jury still could have returned a verdict with royalty rates higher than the rates the jury actually found. Based on that alone, the jury's verdict was supported by substantial evidence.

To the extent Realtek's argument is construed as a *Daubert* challenge that Dr. Layne-Farrar's testimony was so unreliable as to not be admissible under the Federal Rules of Evidence, Realtek's motion is also denied. Expert testimony is admissible pursuant to Federal Rule of

Evidence 702 if it is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Here, the court acts as a gatekeeper to exclude junk science. *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014); *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Daubert*, 509 U.S. at 589-90.

Dr. Layne-Farrar's testimony does not approach the level of unreliability necessary for exclusion under *Daubert*. Dr. Layne-Farrar presented a methodology for determining the number of Agere standard essential patents—i.e. consulting with Mr. Waskiewicz to estimate a standard essential patents figure. Dr. Layne-Farrar was subjected to cross-examination on this issue, and Realtek took advantage of this opportunity by presenting evidence (in the form of an additional standard essential patent) intended to make the jury question Dr. Layne-Farrar's credibility. Dr. Layne-Farrar initially adjusted her figure based on Realtek's questioning, and then on redirect testified that the jury would not be wrong to rely on her higher royalty figure because her initial estimate could have been over-inclusive. All of this testimony evidences the type of detailed methodological investigation that *Daubert* envisions. Dr. Layne-Farrar's methodology was reliable because it was testable and subject to critique. *Daubert*, 509 U.S. at 593-94. If anything, courts should encourage experts to honestly adjust their calculations based on criticisms raised by the other party during cross-examination, and not exclude expert testimony under *Daubert* every time an expert admits that a minor error in estimation was possible. Dr. Layne-Farrar's calculations were based on a reliable, testable, quantitative methodology, and are thus not subject to exclusion under *Daubert*. Realtek's motion is denied as to the RAND royalty rates.

## IV. ORDER

For the foregoing reasons, the court DENIES both LSI and Realtek's motions for judgment as a matter of law.

**IT IS SO ORDERED.**

Dated: June 16, 2014

RONALD M. WHYTE
United States District Judge

United States District Court
For the Northern District of California



FILED

FEB 25 2014
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| REALTEK SEMICONDUCTOR, CORPORATION,<br>Plaintiff,<br>v.<br>LSI CORPORATION AND AGERE SYSTEMS LLC,<br>Defendants. | Case No. C-12-3451-RMW<br>FINAL<br>**JURY INSTRUCTIONS** |

United States District Court
For the Northern District of California

# TABLE OF CONTENTS

DUTY OF JURY ..... 3
CONDUCT OF THE JURY ..... 4
TASK OF THE JURY ..... 6
WHAT IS EVIDENCE ..... 7
WHAT IS NOT EVIDENCE ..... 8
DIRECT AND CIRCUMSTANTIAL EVIDENCE ..... 9
CREDIBILITY OF WITNESSES ..... 10
DEPOSITION TESTIMONY IN LIEU OF LIVE TESTIMONY ..... 11
EXPERT OPINION ..... 12
CHARTS AND SUMMARIES ..... 13
STIPULATIONS OF FACT ..... 14
RAND DETERMINATION – HYPOTHETICAL NEGOTIATION ..... 16
RAND DETERMINATION – TYPES OF ROYALTIES ..... 17
RAND DETERMINATION – DETERMINING A RAND ROYALTY RATE ..... 18
RAND DETERMINATION – CONSIDERATION OF LICENSES ..... 19
BREACH OF CONTRACT – DAMAGES ..... 20
BREACH OF CONTRACT – MITIGATION OF DAMAGES ..... 21
DUTY TO DELIBERATE ..... 22
COMMUNICATION WITH COURT ..... 23
RETURN OF VERDICT ..... 24

United States District Court
For the Northern District of California

**INSTRUCTION NO. 1**

**DUTY OF JURY**

Members of the Jury: Now that you have heard all of the evidence, it is my duty to instruct you as to the law of the case.

Each of you has received a copy of these instructions that you may take with you to the jury room to consult during your deliberations.

You must not infer from these instructions or from anything I may say or do as indicating that I have an opinion regarding the evidence or what your verdict should be.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all important.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

**INSTRUCTION NO. 2**

**CONDUCT OF THE JURY**

I will now repeat a few words I read to you at the beginning of trial about your conduct as jurors.

First, keep an open mind, and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations.

Second, because you must decide this case based only on the evidence received in the case and on my instructions as to the law that applies, you must not be exposed to any other information about the case or to the issues it involves during the course of your deliberations. Thus, until the end of the case or unless I tell you otherwise:

> Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone or electronic means, via e-mail, text messaging, or any Internet chat room, blog, Web site or other feature. This applies to communicating with everyone else besides your fellow jurors during deliberations, including your family members, your employer, the media or press, and the people involved in the trial. But, if you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter. You must also report the contact to the court.

> Because you have received all the evidence and are receiving all legal instruction you properly may consider to return a verdict: do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address. A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to any outside information, please notify the court immediately.

United States District Court
For the Northern District of California

**INSTRUCTION NO. 3**

**TASK OF THE JURY**

On May 20, 2013, I found (1) that LSI entered into a binding contract with the International Electrical and Electronics Engineers ("IEEE") to offer licenses to its declared standard essential patents, including the '958 and '867 patents, on a reasonable and nondiscriminatory ("RAND") basis, (2) that Realtek is a third-party beneficiary to that contract, and (3) LSI breached its contract by failing to offer a license to the declared standard essential '958 and '867 patents before filing an action at the ITC seeking an exclusion order and injunctive relief.

Your task, as jurors, is to decide two issues. The first is to determine, based on the evidence presented, the appropriate royalty rate for the '958 and '867 patents that LSI would need to offer to Realtek to comply with LSI's RAND obligations. I will provide specific instructions on how to determine that royalty, based on the evidence presented.

Second, you are asked to determine if Realtek is entitled to damages for LSI's breach of contract, and, if so, the amount of those damages.

**INSTRUCTION NO. 4**

**WHAT IS EVIDENCE**

The evidence you are to consider in deciding what the facts are consists of:

1. the sworn testimony of any witness;
2. the exhibits which were received into evidence; and
3. any facts to which the lawyers have agreed.

United States District Court
For the Northern District of California

**INSTRUCTION NO. 5**

**WHAT IS NOT EVIDENCE**

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

(1) Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, will say in their closing arguments, and have said at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

(2) Objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

(3) Testimony that has been excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered. In addition sometimes testimony and exhibits are received only for a limited purpose; when I gave a limiting instruction, you must follow it.

(4) Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

United States District Court
For the Northern District of California

**INSTRUCTION NO. 6**

**DIRECT AND CIRCUMSTANTIAL EVIDENCE**

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

United States District Court
For the Northern District of California

**INSTRUCTION NO. 7**

**CREDIBILITY OF WITNESSES**

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it. Proof of a fact does not necessarily depend on the number of witnesses who testify about it.

In considering the testimony of any witness, you may take into account:

(1) the opportunity and ability of the witness to see or hear or know the things testified to;

(2) the witness's memory;

(3) the witness's manner while testifying;

(4) the witness's interest in the outcome of the case and any bias or prejudice;

(5) whether other evidence contradicted the witness's testimony;

(6) the reasonableness of the witness's testimony in light of all the evidence; and

(7) any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.

**United States District Court**
For the Northern District of California

**INSTRUCTION NO. 8**

**DEPOSITION TESTIMONY IN LIEU OF LIVE TESTIMONY**

A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth and lawyers for each party may ask questions. The questions and answers are recorded.

You should consider deposition testimony, presented to you in court in lieu of live testimony, insofar as possible, in the same way as if the witness had been present to testify.

Do not place any significance on the behavior or tone of voice of any person who read the questions or answers.

United States District Court
For the Northern District of California

**INSTRUCTION NO. 9**

**EXPERT OPINION**

Some witnesses, because of education, training or experience, were permitted to state opinions and the reasons for those opinions.

Opinion testimony should be judged just like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education, training and experience, the reasons given for the opinion, and all the other evidence in the case.

**INSTRUCTION NO. 10**

**CHARTS AND SUMMARIES**

Certain charts and summaries have been received into evidence to illustrate information brought out in the trial. Charts and summaries are only as good as the underlying evidence that supports them. You should, therefore, give them only such weight as you think the underlying evidence deserves.

Certain other charts and summaries not received in evidence have been shown to you in order to help explain the contents of books, records, documents, or other evidence in the case. They are not themselves evidence or proof of any facts. If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

**INSTRUCTION NO. 11**

**STIPULATIONS OF FACT**

The parties have agreed to certain facts that have been read to you. You should therefore treat these facts as having been proved. The parties have either stipulated to or the Court has already determined the following facts:

1. Plaintiff Realtek Semiconductor Corporation is Taiwanese corporation with its principal place of business in Hsinchu, Taiwan.

2. Defendant LSI Corporation is a Delaware corporation with its principal place of business in San Jose, California.

3. Defendant Agere Systems is a Delaware corporation with its principal place of business in Allentown, Pennsylvania. Agere is currently a wholly-owned subsidiary of LSI.

4. The International Electrical and Electronics Engineers ("IEEE") develops standards through its internal Standards Association ("IEEE-SA").

5. The IEEE-SA develops the 802.11 wireless communication standard, also known as "WLAN" or "Wi-Fi," which was first released in 1997 and has been amended and revised numerous times since then (e.g. 802.11a, 802.11b, 802.11g, 802.11n).

6. In January 2003, Agere submitted a "Letter of Assurance" to the IEEE-SA in connection with the development the 802.11g standard, stating that it owned patents, including United States Patent Nos. 6,452,958 ("'958 patent") and 6,707,867 ("'867 patent") or applications leading thereto, which may be required to practice the proposed standard and stated it "is prepared to grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to comply with the [Proposed] IEEE Standard."

7. In September 2003, Agere submitted a "Letter of Assurance" to the IEEE-SA in connection with the development of the 802.11e standard, stating that it owned patents, including the '867 patent application, which may be required to practice the proposed standard and stated it "is prepared to grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to comply with the [Proposed] IEEE Standard."

8. The '958 patent and '867 patent were among the patents which Agere committed to license on reasonable and non-discriminatory terms and conditions.

9. As the parent company of Agere, LSI agrees to be bound by the commitments that Agere made to the IEEE.

10. The Court has found that Defendants entered into a binding contract with the IEEE to license their declared standard essential patents, the '958 and '867 patents, on reasonable and non-discriminatory ("RAND") terms.

11. The Court has found that Realtek is a third-party beneficiary to Defendants' contract with the IEEE, because it makes and sells integrated circuits that are compatible with the 802.11 standards.

12. On March 12, 2012, Defendants filed a complaint before the International Trade Commission ("ITC") alleging patent infringement of the '958 and '867 patents and seeking injunctive relief against Realtek.

13. Earlier in this case, I ruled that Defendants "breached their RAND licensing obligations to Realtek by failing to offer a license to the declared standard essential '958 and '867 patents before filing [an] action at the ITC seeking an exclusion order and injunctive relief."

United States District Court
For the Northern District of California

**INSTRUCTION NO. 12**

**RAND DETERMINATION – HYPOTHETICAL NEGOTIATION**

As I previously advised you, one of your tasks is to determine, based upon the evidence presented, the appropriate royalty rate for the '958 and '867 Patents that LSI needs to offer to Realtek to comply with LSI's RAND obligations. Whether or not Realtek infringes the two LSI patents is not an issue in this case.

A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention. This right is called a "license." A "RAND" royalty rate is a reasonable and nondiscriminatory royalty rate.

In determining the RAND royalty rate, you should consider a hypothetical negotiation between Realtek and LSI over a royalty rate for LSI's two patents. In considering the nature of this negotiation, you must assume that the patent holder and the licensee would have acted reasonably and would have entered into a license agreement. The determination of a RAND royalty rate also assumes that the two LSI patents are essential to the 802.11 standard.

For the purposes of the hypothetical negotiation, you should consider all the facts known and available to the parties at the time Realtek first made, used, or sold products using the standard, which was November 2002. You should not consider LSI's advantage resulting from the standard's adoption, if any. However, you may consider any advantage resulting from the technology's superiority. Your role is to determine what the result of the hypothetical negotiation between Realtek and LSI would have been. You must determine what royalty would have resulted from the hypothetical negotiation and not simply what either party would have preferred.

United States District Court
For the Northern District of California

## INSTRUCTION NO. 13

## RAND DETERMINATION – TYPES OF ROYALTIES

A royalty can be calculated in several different ways and it is for you to determine which way is the most appropriate based on the evidence you have heard. One type of royalty is a percentage royalty, in which the licensee pays the patent holder a certain percentage of its revenue. Another type of royalty is a per unit royalty, in which the licensee pays the patent holder a predetermined amount of money for each unit the licensee sells.

It is up to you, based on the evidence, to decide what type of royalty is appropriate in this case.

United States District Court
For the Northern District of California

**INSTRUCTION NO. 14**

**RAND DETERMINATION – DETERMINING A RAND ROYALTY RATE**

You should follow the two steps below in determining the RAND royalty rate resulting from the hypothetical negotiation:

(1) Consider the importance of the two LSI patents to the standard as a whole, comparing the technical contribution of the two LSI patents to the technical contributions of other patents essential to the standard.

(2) Consider the contribution of the standard as a whole to the market value of Realtek's products utilizing the standard.

United States District Court
For the Northern District of California

**INSTRUCTION NO. 15**

**RAND DETERMINATION – CONSIDERATION OF LICENSES**

You may consider other licenses for patents comparable to the two LSI patents. In determining the comparability of other licenses, you may consider, among others, the following factors:

(1) the patents included in the license agreement,

(2) the date of the license,

(3) any limitations on the use of the licensed technology,

(4) the inclusion of other consideration in the agreement,

(5) whether the license was part of a settlement of litigation or arbitration,

(6) whether the royalty was a lump sum or a running royalty rate, and

(7) opinion testimony of qualified experts.

**INSTRUCTION NO. 16**

**BREACH OF CONTRACT – DAMAGES**

The Court has determined that LSI breached its contractual commitments to the IEEE and to Realtek as a third-party beneficiary of that contract. Your second task is to determine Realtek's damages, if any. Realtek has the burden of proving damages by a preponderance of the evidence. Damages means the amount of money that will reasonably and fairly compensate Realtek for any injury you find was caused by LSI. If you find that Realtek is entitled to damages, you may award:

- The reasonable attorneys' fees and costs Realtek incurred in defending itself against the lawsuit filed by LSI in the United States International Trade Commission.

It is for you to determine what damages, if any, have been proved. Your award must be based upon evidence and not upon speculation, guesswork or conjecture.

**INSTRUCTION NO. 17**

**BREACH OF CONTRACT – MITIGATION OF DAMAGES**

Realtek has a duty to use reasonable efforts to mitigate damages. To mitigate means to avoid or reduce damages.

LSI has the burden of proving by a preponderance of the evidence:

1. that the plaintiff failed to use reasonable efforts to mitigate damages; and
2. the amount by which damages would have been mitigated.

United States District Court
For the Northern District of California

**INSTRUCTION NO. 18**

**DUTY TO DELIBERATE**

When you begin your deliberations, you should elect one member of the jury as your presiding juror. That person will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not hesitate to change your opinion if the discussion persuades you that you should. Do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

**INSTRUCTION NO. 19**

**COMMUNICATION WITH COURT**

If it becomes necessary during your deliberations to communicate with me, you may send a note through the marshal, signed by your presiding juror or by one or more members of the jury. No member of the jury should ever attempt to communicate with me except by a signed writing; I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court. If you send out a question, I will consult with the parties before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone—including me—how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged. Do not disclose any vote count in any note to the court.

Case5:12-cv-03451-RMW Document318 Filed02/26/14 Page24 of 25

**INSTRUCTION NO. 20**

**RETURN OF VERDICT**

A verdict form has been prepared for you. After you have reached unanimous agreement on a verdict, your presiding juror will fill in the form that has been given to you, sign and date it, and advise the court that you are ready to return to the courtroom.

**United States District Court**
For the Northern District of California

- 24 -

ER-0051

**JURY INSTRUCTION NO. 21**

**EVIDENCE IN ELECTRONIC FORMAT**

Those exhibits capable of being displayed electronically will be provided to you in that form, and you will be able to view them in the jury room. A computer will be available to you in the jury room.

A court technician will show you how to operate the computer and other equipment; how to locate and view the exhibits on the computer. If you need additional equipment or supplies, you may make a request by sending a note.

In the event of any technical problem, or if you have questions about how to operate the computer, you may send a note to the bailiff, signed by your foreperson or by one or more members of the jury. Be as brief as possible in describing the problem and do not refer to or discuss any exhibit you were attempting to view.

If a technical problem or question requires hands-on maintenance or instruction, a court technician may enter the jury room with the bailiff present for the sole purpose of assuring that the only matter that is discussed is the technical problem. When the court technician or any non-juror is in the jury room, the jury shall not deliberate. No juror may say anything to the court technician or any non-juror other than to describe the technical problem or to seek information about operation of equipment. Do not discuss any exhibit or any aspect of the case.

The sole purpose of providing the computer in the jury room is to enable jurors to view the exhibits received in evidence in this case. You may not use the computer for any other purpose. At my direction, technicians have taken steps to make sure that the computer does not permit access to the Internet or to any "outside" website, database, directory, game, or other material. Do not attempt to alter the computer to obtain access to such materials. If you discover that the computer provides or allows access to such materials, you must inform me immediately and refrain from viewing such materials. Do not remove the computer or any electronic data or disk from the jury room, and do not copy any such data.

Pages ER-0053 and ER-0054
Intentionally Left Blank

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

REALTEK SEMICONDUCTOR, CORPORATION,

Plaintiff,

v.

LSI CORPORATION AND AGERE SYSTEMS LLC,

Defendants.

Case No. C-12-3451-RMW

**ORDER RE PRETRIAL EVIDENTIARY OBJECTIONS**

**[Re: Dkt. Nos. 233, 244]**

1. **LSI's objection to Realtek's billing invoices as subject to a motion in limine, belated production, and hearsay**. Dkt. No. 233 at 15.

**OVERRULED.** The court has previously ruled on the objection to the billing records as not having been produced timely. Specifically, the court denied LSI's motion to exclude the billing records based upon Realtek's late production. However, to alleviate any prejudice to LSI by the late production, the court allowed LSI leave to offer an expert to testify on the reasonableness of Realtek's damages. As for the hearsay objection, the court notes that Realtek may satisfy its prima facie obligation to establish damages by offering authenticated billing records to show the amount it paid its lawyers for defense of the ITC investigation.

United States District Court
For the Northern District of California

*See Jackson v. Yarbray*, 179 Cal. App. 4th 75, 95-96 (2009). They would not be hearsay for that purpose because they are not being offered for the truth of the matter asserted (i.e., that Realtek's ITC attorneys worked the hours shown and spent time on the items described). Should LSI raise a mitigation defense that, as one example, certain billed items were not necessary, any Realtek rebuttal witness would be required to establish the predicate elements of the business records hearsay exception or some other exception to the hearsay rule in order to present the billing records as evidence of the reasonableness of the fees.

2. **Realtek's objection to certain licensing agreements between LSI and third parties and between Realtek and third parties as irrelevant and prejudicial**. Dkt. No. 233 at 15-16. **OVERRULED.**

3. **Deposition Designations Group One** (Abhi Talwalkar). Dkt. No. 244-1 at 1-2. **SUSTAINED.**

4. **Deposition Designations Group Two** (Abhi Talwalkar). Dkt. No. 244-1 at 3-4. **OVERRULED.**

5. **Deposition Designations Group Three** (Abhi Talwalkar). Dkt. No. 244-1 at 5-6. **SUSTAINED.**

6. **Deposition Designations Group Four** (Ryan Phillips). Dkt. No. 244-1 at 7. **OVERRULED.**

Dated: February 7, 2014

RONALD M. WHYTE
United States District Judge

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| REALTEK SEMICONDUCTOR CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>LSI CORPORATION and AGERE SYSTEMS LLC,<br><br>Defendants. | Case No. C-12-03451-RMW<br><br>**RULINGS ON MOTIONS *IN LIMINE* AND *DAUBERT* MOTIONS**<br><br>**[Re: Docket Nos. 174, 179]** |

## I. DEFENDANTS' *IN LIMINE* AND *DAUBERT* MOTIONS

**Motion *in Limine* No. 1: To preclude reference to the Administrative Law Judge's ("ALJ") non-infringement decision in pending International Trade Commission ("ITC") action**

**GRANTED.** Defendants LSI Corporation and Agere Systems LLC (collectively "LSI") move *in limine* to preclude plaintiff Realtek Semiconductor Corporation ("Realtek") from referencing the ALJ's Initial Determination in an ITC action involving LSI and Realtek. Specifically, the ALJ found that Realtek does not infringe the patents-in-suit. Both parties' experts have based their reasonable and nondiscriminatory ("RAND") royalty rate calculations for the

patents-in-suit on the assumption that the patents-in-suit are valid and infringed by Realtek. Thus, LSI argues that the ALJ's decision is irrelevant and not admissible under Federal Rule of Evidence ("FRE") 402. In the alternative, LSI argues that the court should exclude the ALJ's decision under FRE 403 because any relevance is outweighed by the danger of unfair prejudice. Realtek continues to assert that the ITC's Initial Determination is relevant and admissible because, "[i]n setting the RAND rate, the court must consider the technical contributions (or lack thereof) of a patent to a standard, and the need for the standard implementer to infringe the patents in order to practice the standard." Realtek's Opp'n 1, Dkt. No. 192-2 (citing *Microsoft Corp. v. Motorola, Inc.*, Case No. 10-1823, 2013 WL 2111217, at *18 (W.D. Wash. Apr. 25, 2013). Although the court agrees that a final non-infringement decision with respect to the patents-in-suit could be relevant—for example, with respect to the patent's contribution to the technical capabilities of the standard or to the standard implementers' products or the availability of alternatives to the patented technology that could have been written into the standard—the relevance is limited here because of the non-final nature of the ALJ's decision. As discussed in more detail in the court's Order Re: Joint Submission Pursuant to the Supplemental Case Management Order, Dkt. No. 167 at 5 ("September 26, 2013 Order"), the court concludes that any limited relevance is outweighed by the danger of unfair prejudice and misleading the jury.

Accordingly, the court GRANTS LSI's Motion *In Limine* No. 1.

**<u>Motion *in Limine* and *Daubert* Motion No. 2</u>: To preclude plaintiff's economic expert Dr. Leonard's testimony concerning the RAND rate in the *Microsoft* case**

**DENIED.** LSI moves *in limine* and under the *Daubert* standard to preclude Realtek from presenting Dr. Leonard's expert testimony based on Judge Robart's calculations of the RAND rate for twenty-four of Motorola's 802.11 standard essential patents ("SEPs") in *Microsoft v. Motorola*. LSI contends that using Judge Robart's determination, as apportioned to the patents-in-suit here, is an arbitrary starting place for a RAND determination.

United States District Court
For the Northern District of California

Realtek counters that the *Microsoft* rate is "a relevant comparable to use as a benchmark because in *Microsoft*, Judge Robart similarly determined [as did Dr. Leonard here, that] Motorola's 802.11 [SEPs] were of minimal *ex ante* value." Realtek's Opp'n 3. Moreover, Realtek argues that Dr. Leonard does not rely on Judge Robart's RAND determinations as a starting point, but rather uses a comprehensive analysis of a variety of licenses, including Judge Robart's RAND calculations, modified by the *Georgia Pacific*[1] factors, to determine the appropriate RAND rate for the patents-in-suit.

In his expert report, Dr. Leonard considers two RAND rates determined by Judge Robart for twenty-four of Motorola's 802.11 SEPs. Judge Robart calculated one RAND rate for Microsoft's non-Xbox products and another for the Xbox. Dr. Leonard apportions the *Motorola* court-determined RAND rates (which applied to Motorola's twenty-four SEPs) to the two patents-in-suit here, by dividing the rates by twelve. Dr. Leonard then uses these court-determined values, along with other license agreements, as data points in determining the lower bounds of what LSI would be willing to accept and the upper bounds on what Realtek would be willing to pay in a hypothetical negotiation. *See* Leonard Report ¶ 144, Dkt. No. 175-1 (under seal). Contrary to LSI's assertion, Dr. Leonard did not use Judge Robart's RAND determinations, or his apportionment thereof, as a "starting point" for a reasonable royalty calculation. Rather, Dr. Leonard selects another Realtek license with a third-party as "the best benchmark for the outcome of the hypothetical negotiation between Realtek and LSI/Agere." *Id.* ¶ 174. Dr. Leonard concludes that this benchmark is "*further supported* by Judge Robart's finding of the appropriate RAND royalties for Motorola's 802.11 [SEPs]." *Id.* ¶ 175 (emphasis added). Contrary to LSI's assertion, Dr. Leonard's testimony concerning the court-determined RAND rates in *Microsoft v. Motorola* is not arbitrary but tailored to patents that were similarly determined to contribute minimal *ex ante* value to the 802.11 standard. Dr. Leonard's reliance on the court-determined RAND rates in *Microsoft* as part of a more

[1] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).

comprehensive analysis, in conjunction with other third-party licenses, is not arbitrary. Although the apportionment technique used by Dr. Leonard (to reflect the two patents-in-suit here versus the twenty-four Motorola SEPs) assumes equal contributions by each of the twenty-four patents and does not account for the relative contributions, the court nevertheless considers it a satisfactory way to reflect the RAND royalty rate that might pertain to two, versus twenty-four patents and is a reasonable point of comparison as part of Dr. Leonard's more comprehensive analysis.

Accordingly, the court DENIES LSI's Motion *In Limine* and *Daubert* Motion No. 2.

**Motion *in Limine* and *Daubert* Motion No. 3: To exclude testimony of Richard Donaldson**

**GRANTED.** LSI moves *in limine* and under the *Daubert* standard to exclude the expert testimony of Richard Donaldson ("Donaldson") directed to whether LSI's June 20, 2012 proposal to Realtek complied with LSI's RAND commitments. LSI argues that Mr. Donaldson's report goes only to breach of contract liability, which is no longer at issue in this case, and thus is not relevant. Realtek counters that Mr. Donaldson's testimony is directly relevant to the issue of whether Realtek failed to mitigate its damages. Realtek, however, has also moved *in limine* to exclude LSI from relying on the June 20, 2012 proposal as part of any defense that Realtek failed to mitigate its damages. As discussed *infra* under Realtek's motions, the court concludes that any evidence regarding the June 20, 2012 proposal cannot be considered on the issue of mitigation of damages. LSI did not dismiss Realtek from the ITC action prior to its purported attempt to negotiate. Realtek was under no duty to negotiate in an unfair bargaining position under the threat of an exclusion order. In light of the court's ruling excluding evidence or argument regarding the June 20, 2013 offer, Donaldson's opinion going to whether LSI's June 20, 2012 proposal was a RAND offer is excluded.

Thus, the court GRANTS LSI's Motion *In Limine* and *Daubert* Motion No. 3.

**<u>Motion *in Limine* and *Daubert* Motion No. 4</u>: To preclude Realtek from introducing: (1) Dr. Leonard's purported expert opinion on breach of contract damages; and (2) its ITC proceeding legal invoices to prove breach of contract damages**

**GRANTED-IN-PART AND DENIED-IN-PART.** LSI moves *in limine* and under the *Daubert* standard to preclude Realtek from introducing at trial redacted billing records from its counsel in the ITC action and Dr. Leonard's analysis thereof in his expert reports on breach of contract damages. According to LSI, the billing records are so heavily redacted that it is impossible to tell whether the fees are reasonable. LSI contends that Dr. Leonard failed to opine on the *reasonableness* of attorneys' fees (and is not qualified to do so in any event), but simply added up the total fees and costs incurred from Realtek's redacted invoices.

Realtek represents that, following LSI's motion *in limine*, it made a supplemental production of its invoices from the ITC action, removing most of the redactions, such that LSI may review the billing records for reasonableness. Realtek further argues that Dr. Leonard was qualified to make the damages calculations.

As Dr. Leonard performed little more than simple addition of the legal invoice totals, the court finds that his *calculations* of Realtek's damages in defending the ITC action are admissible. *See* Exhibit 7 to Leonard's Supplemental Expert Report, Dkt. No. 175-6 (adding Realtek's ITC related litigation expenses); *Microsoft v. Motorola*, C-10-1823-JLR, 2013 WL 4008822, at *6 (W.D. Wash. Aug. 5, 2013) ("There is not, however, an implicit requirement in Federal Rule of Evidence 702 that the proffered expert make complicated mathematical calculations."). The court, however, limits Dr. Leonard's testimony to explaining only Realtek's expenses actually incurred in defending the ITC action, and *not the reasonableness thereof*, which would likely require some knowledge or expertise in ITC litigation.[2] There is no evidence, however, that Realtek incurred greater than

[2] Contrary to LSI's position, LSI's economic expert Dr. Layne-Farrar opined that "breach of contract damages . . . will amount to the reasonable and unavoidable legal expenses that Realtek incurred in the ITC matter. When sufficient documentation becomes available, *I will calculate that figure*." Layne-Farrar Report ¶ 170(a), Dkt. No. 178-6 (emphasis added). Thus, LSI cannot very well argue that Realtek's economic expert is unqualified to calculate legal expenses when its

Case: 14-16319, 12/12/2014, ID: 9348252, DktEntry: 16-1, Page 66 of 92

normal attorneys' fees in defending the ITC action. In fact, Realtek's invoices show that on multiple occasions Realtek paid its invoices early to receive a fifteen percent discount on its legal fees. Absent any indication that Realtek's attorneys overcharged Realtek for its ITC defense, the court concludes that Realtek's actual invoices from the ITC proceedings would satisfy Realtek's initial burden to supply the actual amount of damages it suffered in conjunction with its ITC defense. *See* Restatement (Second) of Contracts § 347 (1981) (stating that, subject to the duty to mitigate damages, *inter alia*, the injured party may recover its actual loss suffered). LSI, should it choose to so argue, would then have the burden of showing that Realtek failed to mitigate damages by incurring unreasonable attorneys' fees. *Cummings v. Amtrak Nat'l R.R. Passenger Corp.*, 199 F.3d 1331 (9th Cir. 1999) (the breaching party has "the burden to prove by a preponderance of the evidence (1) that plaintiff failed to use reasonable efforts to mitigate damages and (2) the amount by which damages would have been mitigated").

Realtek supplied unredacted invoices of its attorneys' fees to LSI but only after the close of discovery. LSI may still review the newly submitted invoices from Realtek and present any arguments that Realtek's attorneys' fees are unreasonable, so the court will not grant LSI's motion *in limine* as to Realtek's invoices. However, because this supplemental production occurred after the close of discovery, LSI may not have had sufficient opportunity to evaluate the reasonableness of Realtek's attorneys' fees. Therefore, to avoid prejudice to LSI, the court concludes that LSI may present a qualified expert on the issue of the reasonableness of Realtek's fees on the condition that his or her expert report on the reasonableness of those fees is provided to Realtek before trial. Realtek, however, is not entitled to re-open discovery with respect to that expert as unredacted invoices should have been made available to LSI before the close of discovery. The court GRANTS-IN-PART and DENIES-IN-PART LSI's Motion *In Limine* No. 4.

---

economic expert represents that she will do the same. However, in response to Realtek's motion *in limine* to exclude Dr. Layne-Farrar's expert opinion on damages, LSI represents that Dr. Layne-Farrar will not testify as to Realtek's failure to mitigate damages, and is not qualified to do so.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

## II. PLAINTIFF'S AMENDED *IN LIMINE* AND *DAUBERT* MOTIONS

***Daubert* Motion: To exclude the opinion and testimony of defendants' economic expert Dr. Layne-Farrar that rely on a flawed comparison of the calculated value of the "Via Pool" with that of the LSI SEPs in arriving at a value for the patents-in-suit.**

**GRANTED.** Plaintiff seeks to exclude the portions of the rebuttal opinion of LSI's economics expert Dr. Layne-Farrar that rely on the "Via Pool" on the grounds that she engages in an unreliable and flawed methodology for determining the value of the patents-in-suit in comparison to the Via Pool. [3]

Dr. Layne-Farrar relies on the Via Pool as one benchmark in her more comprehensive analysis of third-party licenses. *See* Layne-Farrar Report ¶¶ 104-107.[4] She recognizes that the Via Pool is "an imperfect RAND benchmark," *id.* ¶ 113, but nevertheless includes it in her analysis. With respect to the Via Pool analysis, Dr. Layne-Farrar concludes that it would be unreasonable to simply divide the royalty rate for a license to the pool by the total number of patents in the pool to come up with a RAND royalty-rate per patent. *Id.* ¶ 116. Instead, she applies a "patent citation" analysis to determine the comparative value of LSI's 802.11 SEPs to the patents in the Via Pool. She performs this patent citation analysis by calculating the number of times all nineteen of LSI's 802.11 SEPs are cited in later patents. She then performs the same patent citation analysis with respect to 377 patents she believes are part of the 802.11 standard (and a part of the Via Pool) in order to obtain a ratio of the value of LSI's 802.11 SEPs in comparison to the other 802.11 SEPs in the Via Pool. Based on her citation analyses, calculations, and comparisons, she concludes that LSI's 802.11 SEP portfolio is about three times more valuable than the Via Pool patent portfolio. *Id.* ¶ 128. Thus, she multiples the Via Pool royalty rate by 2.5 to obtain a "conservative" benchmark royalty rate for LSI's 802.11 SEP portfolio. *Id.* From there, for lack of a better way to apportion the

[3] Dr. Layne-Farrar's expert report indicates that neither patent-in-suit is part of the Via Pool. Layne-Farrar Report ¶ 82, Dkt. No. 170-2 (under seal).
[4] She concludes, however, that a license between LSI and a third party is the most helpful benchmark for her RAND royalty rate calculation. *Id.* ¶¶ 108-112.

value down to the two patents-in-suit, she simply divides the determined royalty rate for LSI's 802.11 SEP portfolio by nineteen (the number of patents therein) to determine the RAND royalty rate for each individual patent. *Id.* ¶¶ 139-141.

Although Dr. Layne-Farrar's patent counting method may be an acceptable methodology to determine the relative value of patent portfolios, *see id.* ¶¶ 117-119, the fact that she applied this methodology to determine the value of LSI's *entire* 802.11 SEP portfolio but then did not use it in calculating the value of the two patents-in-suit results in a skewed and misleading analysis. As Realtek points out, Dr. Layne-Farrar's report indicates that a vast majority (93%) of the citations attributed to LSI's 802.11 SEP portfolio come from another patent, which is not one of the patents-in-suit. If Dr. Layne-Farrar had calculated the value of *only* the patents-in-suit based on the patent citation analysis, the value revealed for those two patents would represent only 0.1% of the value of the LSI's entire portfolio. At her deposition, in response to questions about why she did not perform the patent citation with respect to the two patents-in-suit, she responded:

> [A]s I discussed in the report, this apportionment method is good for portfolios. It was designed to analyze groups of patents. And *when you get down to individual patents, it is not as reliable*. It's—it's a large numbers approach and so that's why I didn't use the patent citation apportionment for just the—low numbers of patents, the one and the two.
>
> …
>
> Again, I'm not using this method for patent valuation. I'm using it to apportion and it's not an appropriate measure for apportioning down to individual patents. There's lots of numbers and lots of statistics that are good for—for groups of things that aren't good for individuals and this is one of them. And so *I didn't view this method as appropriate for singling out the '958 or the '867 patents*.

Bell Decl. Ex. 1 at 96:15-23, Dkt. No. 196-1; 97:12-19 (emphasis added). By her own admission, the patent valuation method is not appropriate for determining the value of individual patents. Because the issue in this case is the value of the two patents-in-suit—not LSI's entire 802.11 SEP portfolio—Dr. Layne-Farrar's utilization of this approach to assess the value of LSI's entire 802.11 SEP portfolio results in an unreliable damages calculation.

Accordingly, the court GRANTS Realtek's *Daubert* motion and excludes any evidence or testimony from Dr. Layne-Farrar based on the Via Pool that goes to the value of LSI's *entire* 802.11 SEP portfolio, particularly since one of the patents in LSI's SEP portfolio accounts for 93% of the pool's citations.

**<u>Motion *In Limine* No. 1</u>: To exclude evidence and argument regarding the 2002/2003 correspondence between Agere and Realtek**

**GRANTED.** Realtek moves *in limine* to exclude the evidence and argument regarding the 2002/2003 correspondence between Realtek and Agere (now wholly owned by LSI). LSI contends that this correspondence is relevant to Realtek's willingness to mitigate its damages by negotiating a RAND license. The court disagrees with LSI that the 2002/2003 correspondence between Realtek and Agere is relevant to mitigation of damages. The court already determined that LSI breached its contract to the IEEE and to Realtek as a third party beneficiary, and thus any mitigation of damages would necessarily occur *after* the breach. The 2002/2003 correspondence is otherwise irrelevant to the two remaining issues in this case: (1) a determination of a RAND royalty rate for the patents-in-suit; and (2) a determination of Realtek's damages for LSI's breach of contract.

Accordingly, the court GRANTS Realtek's Motion *In Limine* No. 1 and excludes evidence or arguments regarding this correspondence under FRE 402. Further, if the evidence were deemed to have any probative value, that value would be substantially outweighed by a danger of misleading the jury and wasting time. *See* FRE 403.

**<u>Motion *In Limine* No. 2</u>: To exclude evidence or argument concerning alleged infringement of defendants' patents by Realtek**

**GRANTED-IN-PART AND DENIED-IN-PART.** Realtek seeks to exclude: (1) Dr. Negus's opinion that Realtek practices the patents-in-suit; (2) any speculation about the final outcome of the ITC action; and (3) any testimony from Dr. Layne-Farrar (LSI's economic expert) as to the value of a lump-sum royalty based on Realtek's past "infringement." LSI does not oppose the

United States District Court
For the Northern District of California

second subpart of Realtek's Motion *In Limine* No. 2. With respect to the first subpart, LSI argues that Dr. Negus's opinion is relevant because it goes to the usefulness of the technology of the patents-in-suit to Realtek and others in the industry, which is directly relevant to the determination of a RAND royalty. As to the third subpart, LSI argues that a one-time, fully paid up lump sum payment by Realtek is the appropriate royalty calculation to be used in this case.

Except for the presumption that the patents-in-suit are valid and infringed for the purposes of the RAND royalty determination, the issue of whether Realtek actually infringes the patents-in-suit is before the ITC and not at issue before this court. As stated in the court's September 26, 2013 Order, the RAND issue in this case is "[a] determination of a RAND royalty rate for the '958 and '867 Patents." *Id.* at 1. Thus, Dr. Layne-Farrar's calculation of a lump-sum royalty payment based upon alleged past infringement by Realtek is inappropriate.

Accordingly, LSI may not introduce: (1) evidence or argument that Realtek infringes the patents-in-suit; (2) Dr. Negus's opinion to the extent it concludes or suggests via an *infringement analysis* that Realtek would be *liable* for infringement of the patents-in-suit;[5] (3) any speculation about the final outcome of the ITC action; or (4) Dr. Layne-Farrar's testimony of a lump sum royalty *owed* by Realtek based on *past infringement* of the patents-in-suit. Dr. Layne-Farrar may, however, offer her opinion regarding an appropriate lump sum RAND royalty payment based on industry standards or some other measure.

The court GRANTS-IN-PART and DENIES-IN-PART Realtek's Motion *In Limine* No. 2 as set forth above.

---

[5] However, going to the RAND royalty determination, LSI may introduce Dr. Negus's opinion regarding: (1) the value of the technology of the patents-in-suit to Realtek and others in the industry; and (2) Realtek's past lump sum royalty payment(s) to a *third-party* to the extent that testimony is otherwise relevant and admissible under the *Daubert* standard to determining an appropriate RAND royalty rate in this case.

**Motion *In Limine* No. 3: To exclude evidence or argument that Realtek failed to mitigate its damages**

**GRANTED-IN-PART AND DENIED-IN-PART.** Realtek seeks to exclude: (1) expert testimony on the topic of Realtek's failure to mitigate its damages; (2) evidence or argument of defendants' June 2012 license proposal, or that Realtek failed to respond thereto; (3) evidence or argument concerning the parties' settlement negotiations; and (4) evidence or argument regarding Realtek's other lawsuits against LSI. The court addresses each separately.

**(1) Expert testimony regarding Realtek's failure to mitigate – GRANTED**

LSI represents that it does not intend to offer expert testimony from Dr. Layne-Farrar on the issue of mitigation of damages (and likewise moved *in limine* to exclude Realtek's expert, Dr. Leonard from testifying to damages generally). According to LSI, opinion testimony from either party's economic expert on the issue of *mitigation* of damages is inappropriate. The court agrees, and excludes both parties' expert testimony on the issue of *mitigation* of damages, subject to the analysis *supra* with respect to the admissibility of Dr. Leonard's damages calculations generally.

**(2) LSI's June 20, 2012 license proposal – GRANTED**

Realtek argues that LSI's June 20, 2012 licensing proposal is not relevant to LSI's mitigation defense because the court has already decided that LSI breached the contract to the IEEE and to Realtek as a third party beneficiary by failing to license on RAND terms, and any licensing negotiation thereafter would be inherently unfair based on the threat of an injunction. Thus, Realtek argues that "because [LSI] did not withdraw (and still ha[s] not withdrawn) the ITC action and corresponding threat of an injunction," Realtek's Mot. 17, Dkt. No. 178-5, it was under no obligation to respond to LSI's June 20, 2012 "RAND" offer.

LSI counters that the court has already concluded that the June 20, 2012 proposal is relevant to the question of damages, and thus the issue of whether or not Realtek responded to that argument is also relevant. LSI argues that even if the court considers additional arguments going to relevance, the June 20, 2012 offer is relevant because Realtek's failure to negotiate is a central issue in this case.

In the September 26, 2013 Order, the court stated:

> If the jury finds that LSI's June 2012 proposal was in fact a RAND licensing offer, the question arises as to whether Realtek's refusal to accept that offer would be a basis to cut off Realtek's damages related to defending the ITC action. *Or would LSI's offer only mitigate damages if LSI had first dismissed the ITC action against Realtek before making that offer*, so that Realtek would not have been under the looming threat of an ITC exclusion order, which arguably placed it in an unfair bargaining position.

*Id*. at 4. Contrary to LSI's position, the court did not already decide that the June 20, 2012 offer is relevant to mitigation of damages, but rather explicitly deferred consideration of the admissibility of the June 20, 2012 offer until the motions *in limine*. *Id.*

Now the court finds that LSI's June 20, 2012 offer is inadmissible because Realtek had no obligation to mitigate by negotiating a license with LSI after LSI breached its contract to Realtek and where Realtek was still under the threat of an exclusion order from the ITC. "[I]t is appropriate for courts to focus 'not on the failure of the plaintiff to pursue the . . . alternative courses of action suggested by [the] defendant but upon the reasonableness of the action which [the] plaintiff did in fact take. The fact that in retrospect a reasonable alternative course of action is shown to have been feasible is not proof of the fact that the course actually pursued by the plaintiff was unreasonable.'" *Carlisle Ventures, Inc. v. Banco Espanol de Credito S.A.*, 176 F.3d 601, 609 (2d Cir. 1999) (quoting *Zanker Development Co. v. Cogito Sys. Corp.*, 215 Cal. App. 3d 1377, 1381 (1989)). Realtek's refusal to negotiate under the threat of an ITC exclusion order was a reasonable course of action.

At the outset, it is worth noting that LSI was correct when it contended at the December 20, 2013 hearing on this court's tentative order that the threat of an injunction is always present in license negotiations. The patent holder's best alternative to a negotiated agreement in patent license negotiations is typically to file suit, which necessarily involves the threat of an injunction. However, as others have discussed, negotiated patent royalties may often be higher than the true value of the technology because an injunction would impose serious hold-up and switching costs on the accused infringer. *See Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 914 (N.D. Ill. 2012) (Posner, J., sitting by designation); Douglas Lichtman, "Understanding the RAND Commitment," 47 *Houston L. Rev.* 1023, 1039-43 (2010). This concern is especially acute with standard-essential patents because these higher royalties are "in tension with the RAND commitment." "Third Party United

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

States Federal Trade Commission's Statement on the Public Interest," filed on June 6, 2012, in *In re Certain Wireless Communication Devices, Portable Music & Data Processing Devices, Computers & Components Thereof*, Inv. No. 337-TA-745, www.ftc. gov/os/2012/06/1206ftcwirelesscom.pdf (visited December 26, 2013). Therefore, a negotiation arriving at a reasonable royalty rate is unlikely to occur when one party is under the threat of an exclusion order. *See Microsoft Corp. v. Motorola, Inc.*, C-10-1823-JLR, 2013 WL 2111217, at *67 (W.D. Wash. Apr. 25, 2013) ("a RAND royalty rate would be the result of a reasonable SEP patentee and a reasonable implementer negotiating towards a reasonable royalty rate. The threat of a lawsuit, following a history of litigation between the parties, cannot form the basis for such a reasonable negotiation.").

Retuning to LSI's best argument, the court recognizes that the threat of an injunction forms the backdrop to many license negotiations. Still, one fact peculiar to this case distinguishes LSI's June 20, 2012 proposal from the typical license negotiation: LSI had already filed an ITC action against Realtek to enforce the patent at the time it offered Realtek a license to the patent. In a typical license negotiation, the threat of an injunction is not always credible. The threat's credibility depends on the litigation, reputational, and other costs faced by the patent holder. It is still uncertain at what point the patent holder will invoke its best alternative to a negotiated agreement of filing suit. Here, however, LSI has already filed an ITC action against Realtek, so LSI's threat of an exclusion order is thus entirely credible. At this point, LSI possessed especially strong leverage over Realtek, and thus the court cannot call unreasonable Realtek's refusal to negotiate a supposedly "fair, reasonable, and nondiscriminatory" royalty rate with LSI in this weakened position. Therefore, even if a jury were to find that LSI's June 20, 2012 license was compliant with LSI's RAND obligations, Realtek would not be unreasonable in declining to negotiate with LSI under the circumstances. Accordingly, the court excludes all evidence and argument to the jury regarding LSI's June 20, 2012 license offer and Realtek's response thereto.

**(3) The parties' settlement negotiations – GRANTED**

Realtek argues that LSI should be precluded from introducing any evidence or argument of the parties' settlement communications and negotiation status following LSI's June 20, 2012 license proposal under FRE 408 and based on the parties' nondisclosure agreement ("NDA"), which

includes settlement discussions. LSI counters that its introduction of settlement discussions at trial (1) would not violate the parties' NDA because Realtek has already disclosed settlement discussions subject to the NDA including the fact of the June 20, 2012 proposal and (2) would not violate FRE 408 because it does not seek to introduce any "admissions" from the parties' settlement discussions, but only evidence that it attempted to negotiate with Realtek and never received a counter-proposal to its June 20, 2012 proposal.

Because the court excludes LSI's June 20, 2012 proposal, any evidence of settlement discussions and Realtek's willingness to negotiate is also excluded.

**(4) Realtek's other lawsuits against LSI – GRANTED**

Realtek argues that LSI should be precluded from introducing any evidence or argument of Realtek's other litigation[6] against defendants as evidence of Realtek's alleged unwillingness to negotiate in good faith in response to LSI's June 20, 2012 license proposal. According to Realtek, evidence of these lawsuits would be inadmissible character evidence under FRE 404; is not relevant to the issues in this case; and even if it is relevant, it should be excluded under FRE 403 as overly prejudicial. LSI counters that evidence of Realtek's other lawsuits is not character evidence, but rather directly relevant to Realtek's willingness to mitigate its damages.

The court concludes that Realtek's other lawsuits against LSI, which are based on LSI's alleged infringement of Realtek's patents and are not related to the patents-in-suit here, are irrelevant to the issues in the present case. The fact that Realtek seeks to enforce its patent rights in another forum does not indicate that Realtek is less likely to take a license to another set of patents. Even if such evidence were relevant, the likelihood of unfair prejudice outweighs any relevance. Accordingly the court grants subpart 4 to Realtek's Motion *In Limine* No. 3.

---

[6] Realtek has filed its own patent infringement case against LSI and Agere in this district, Case No. 12-3474 (EJD) (stayed pending resolution of an ITC investigation) and has also initiated an ITC investigation against LSI and Seagate Technologies, alleging infringement of the same patents as in the stayed district court case. Realtek has also filed a patent infringement action against LSI in China.

United States District Court
For the Northern District of California

Case: 14-16319, 12/04/2015, ID: 9780221, DktEntry: 16, Page 75 of 92

**Motion *In Limine* No. 4: To exclude evidence or argument that the alleged RAND royalty rate or other RAND terms and conditions should cover licenses to more than the patents-in-suit**

**GRANTED-IN-PART AND DENIED-IN-PART.** Defendants' economic expert Dr. Layne-Farrar calculated RAND rates based on LSI's entire portfolio of 802.11 SEPs (19 patents in total), and in the alternative based on 8 patents within LSI's portfolio that LSI specifically disclosed to the IEEE as essential to the 802.11 standard. Realtek argues that it is impermissible for LSI to present evidence or argument of a royalty rate for licenses to these patent groups, which are larger than the two patents-in-suit. The court agrees to the extent that the issue for the jury is only the determination of a RAND royalty rate for the '958 and '867 Patents. In fact, LSI represents that it has agreed to limit the royalty rate determination for the jury (with respect to the verdict form) to only the '958 and '867 Patents. However, neither party is precluded from introducing one or more of LSI's *third-party* licenses to larger patent portfolios as a point of comparison in the RAND royalty rate analysis, assuming that the analysis is otherwise reliable. Accordingly, the court GRANTS-IN-PART Realtek's Motion *In Limine* No. 4 to the extent that the parties are precluded from offering evidence or argument that the RAND rate to be determined by the jury should cover licenses in addition to those necessary to practice the two patents-at-issue. However, Motion *In Limine* No. 4 is denied to the extent it seeks to preclude LSI from introducing evidence that apportions a royalty rate from a rate for a larger portfolio of patents to arrive at a royalty rate for the two patents-at-issue.

**Motion *In Limine* No. 5: To prohibit use of the ALJ's decision that LSI did not breach its RAND obligations**

**GRANTED.** In the court's September 26, 2013 Order, the court tentatively ruled that the ITC's preliminary noninfringement determinations are inadmissible at trial. The court adopts this tentative ruling and GRANTS Realtek's Motion *In Limine* No. 5.

United States District Court
For the Northern District of California

**<u>Motion *In Limine* No. 6</u>: To exclude ITC trial testimony of Carl Andren and others**

**GRANTED.** In the concurrent ITC proceeding involving LSI and Realtek, third-party Carl Andren ("Andren") testified for Realtek about his involvement in a proposal that led to the inclusion of the '958 Patent in the 802.11 standard. Realtek seeks to exclude Andren's testimony on the grounds that: (1) Andren was never disclosed as a witness in any of LSI's initial disclosures, *see* Fed. R. Civ. P. 37(c); and (2) Andren's ITC trial testimony is inadmissible hearsay that does not fall under the former testimony exception. LSI counters that its failure to "officially" disclose Andren's trial testimony was harmless under Federal Rule of Civil Procedure 37(c) because Realtek was made fully aware of LSI's reliance on Andren's trial testimony as both of LSI's expert reports in this matter rely on Andren's trial testimony. LSI further contends, relying on *Hynix Semiconductor Inc. v. Rambus Inc.*, 250 FRD. 452, 456 n.5 & 458-59 (N.D. Cal. 2008), that the former testimony hearsay exception applies because Realtek had the same opportunity and motive to develop Andren's testimony on this subject in the ITC proceeding.

Although the court agrees that Realtek should have been on notice of Andren's former testimony in the ITC proceeding, Andren's former testimony is nevertheless barred as hearsay. By its terms, the hearsay exception under FRE 804(b) applies only when the "declarant is unavailable as a witness." LSI has made no representation that Andren is unavailable as a witness in this matter. Nor does *Hynix*, the only former testimony case upon which LSI relies, support LSI's position. In *Hynix*, the parties stipulated that "[a]ll depositions or other sworn testimony in the Rambus Related Actions may be used by any party in the Rambus NDCal Cases as if taken in each of the Rambus NDCal Cases." 250 F.R.D. at 455-56. Thus, the court's decision to admit former testimony at trial was based on the court's interpretation of this stipulation. *See id.* No such stipulation exists here.

Accordingly, the court GRANTS Realtek's Motion *In Limine* No. 6.

**IT IS SO ORDERED.**

Dated: January 6, 2014

Ronald M. Whyte

RONALD M. WHYTE
United States District Judge

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

REALTEK SEMICONDUCTOR CORPORATION,

Plaintiff,

v.

LSI CORPORATION and AGERE SYSTEMS LLC,

Defendants.

Case No. C-12-03451-RMW

**ORDER GRANTING PLAINTIFF REALTEK SEMICONDUCTOR CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANTS LSI CORPORATION AND AGERE SYSTEMS LLC'S MOTION TO STAY**

**[Re Docket Nos. 67, 72]**

This dispute concerns whether a holder of patents essential to an industry standard ("standard-essential patents") may commence an action before the U.S. International Trade Commission ("ITC") pursuant to Section 337 of the Tariff Act of 1930 ("Section 337 action") seeking an exclusion order and injunctive relief against a party practicing that standard without violating its obligation to license the standard-essential patents on reasonable and non-discriminatory ("RAND") terms. Plaintiff Realtek Semiconductor Corporation ("Realtek"): (1) moves for summary judgment that defendants LSI Corporation ("LSI") and Agere Systems LLC ("Agere") (collectively, "defendants") breached their licensing obligation by failing to offer a license on RAND terms *before* seeking an exclusion order and injunctive relief in a Section 337 action; and (2) asks the court to issue an order barring defendants from enforcing, or seeking to

enforce, any exclusion order or injunction with respect to the alleged standard-essential patents pending a full "RAND trial" on the merits. Defendants cross-move to stay the case pending the resolution of the ITC action on the basis that Realtek is asserting the same arguments and facts before the ITC.

## I. BACKGROUND

### A. The Standard and the Parties

The standard at issue is the Institute of Electronics Engineers' ("IEEE") standard for wireless Internet connectivity known as "WLAN," "Wi-Fi" or "802.11" (the "802.11 standard").[1] Defendant Agere owns two patents, U.S. Patent Nos. 6,452,958 ("'958 patent") and 6,707,867 ("'867 patent") that it designated as essential to the 802.11 standard. Agere was incorporated in 2000 as a result of a reorganization of Lucent Technologies, Inc., in which Lucent spun off its optoelectric components and microelectronic business into Agere. Defendant LSI acquired Agere in 2001, and Agere is a now wholly owned subsidiary of LSI. Realtek is a Taiwanese integrated circuit designer and supplier, including integrated circuits for WLAN technology.

### B. Defendants' Letters of Assurance and Licensing Proposals

Prior to the release of the 802.11 protocols at issue, in 2003 and 2004, Agere submitted Letters of Assurance, as required by the IEEE Standards Board Bylaws, stating that it "is prepared to grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to comply with the [Proposed] IEEE Standard." Daire Decl., Ex. D (Dkt. No. 67-6) (Letters of Assurance) (alteration in original). Agere's 2003 Letters of Assurance identified the '958 and '867 patents or applications leading up thereto as including "one or more claims that may be required to practice the draft standard for IEEE 802.11e [or 802.11g]." *Id.* The 2004 Letter of Assurance made a similar promise with respect to the IEEE 802.11n standard, but stated that the specific patents essential to that standard were "unknown." *Id.*

#### 1. 2002/2003 ccorrespondences regarding the IEEE 802.11b standard

On October 22, 2002, Agere first contacted Realtek suggesting that Realtek take a license to certain Agere patents, including the '958 patent, allegedly essential to the IEEE 802.11b standard.

[1] For a more detailed description of the history of the 802.11 standard, see the court's Order Granting in Part and Denying in Part Mot. to Dismiss at 2, Dkt. No. 41.

United States District Court
For the Northern District of California

Daire Decl., Ex. F (Dkt. No. 67-8) (2002/2003 letters).[2] Agere's letter stated that Agere was "willing to offer Realtek a license to essential claims of Agere patents for implementing the 802.11b standard at a royalty rate of 5.00% on all 802.11b products sold by Realtek." *Id.* Realtek replied to the letter seeking more specific information regarding Agere's infringement contentions. *Id.* (January 24, 2003 letter). Agere offered to set up a conference call with its patent counsel "to highlight some of the particular claims of the previously referenced Agere patents that [it] believe[d] [we]re relevant to the 802.11b standard." *Id.* (February 5, 2003 letter). Apparently having not heard back, Agere again contacted Realtek a few weeks later to check on "the status of Realtek's analysis and response to Agere's offer to license essential claims relating to the 802.11b standard." *Id.* (March 31, 2003 letter). The correspondences between the parties apparently ceased after this last communication, and Realtek never took a license.

**2. 2012 correspondences**

It was not until March 7, 2012 that a representative of LSI again contacted Realtek and asserted that Realtek products, as incorporated into certain third-party devices, infringe, *inter alia*, the '958 and '867 patents. Daire Decl., Ex. I (Dkt. No. 67-11) (March 7, 2012 letter). LSI's March 7, 2012 letter did not offer a license, but rather asked Realtek to immediately cease and desist from the allegedly infringing activities. *Id.* Less than a week later, defendants filed a complaint with the ITC naming Realtek and others as respondents and alleging, *inter alia*, that Realtek infringed the '958 and '867 patents. *Id.*, Ex. J (Dkt. No. 67-12) ("ITC Complaint"). Based on the ITC Complaint, the ITC instituted Investigation No. 337-TA-837 on April 11, 2012. *Id.*, Ex. K (Dkt. No. 67-13) (ITC Notice). By way of the ITC Section 337 action, defendants seek: (1) a "limited exclusion order" excluding the accused products from entry into the United States; and (2) "permanent cease-and-desist orders" barring Realtek from, *inter alia*, importing the accused products into the United States. ITC Complaint at 55-56.

A little over a month after LSI instigated the ITC proceeding, Realtek sent a letter to LSI requesting that it make the '958 and '867 patents available for a RAND license pursuant to

[2] IEEE 802.11b is an earlier, 1999 amendment to the IEEE 802.11 standard. Compl. ¶ 28. IEEE 802.11e and 802.11g were 2005 and 2007 amendments to the standard (later consolidated into "IEEE 802.11-2007"). *Id.* IEEE 802.11n is the 2009 amendment to the standard. *Id.*

United States District Court
For the Northern District of California

defendants' designation of these patents as essential to the IEEE 802.11 standard and their promise in the Letters of Assurance to the IEEE to license on RAND terms. Daire Decl., Ex. M (Dkt. No. 67-15) (May 24, 2012 "RAND" request). In response, LSI sent a "RAND" license proposal to Realtek. Pannell Decl., Ex. 5 (Dkt. No. 78-5) (LSI's June 20, 2012 email to Realtek attaching "RAND proposal for Realtek"); Daire Decl., Ex. N. (Dkt. No. 67-16) ("RAND" proposal) (under seal). Plaintiff contends that defendants' June 20, 2012 "RAND" proposal, the content of which is under seal, is inherently unreasonable because it reflects the total value of the end product rather than the value of the component parts that Realtek supplies, and would require Realtek to pay a royalty that exceeds the selling price of Realtek's products. Compl. ¶¶ 43, 44.

**C. Procedural History**

On June 29, 2012, Realtek filed the instant action asserting that defendants breached their RAND licensing obligations by initiating the ITC Section 337 action naming Realtek as a respondent before approaching Realtek with a RAND licensing offer. Specifically, Realtek asserted causes of action for: (1) breach of contract, (2) promissory estoppel, (3) declaratory judgment that defendants' must offer Realtek a RAND license or that the alleged "essential" patents are unenforceable as to Realtek, and (4) unfair competition under California Business and Professions Code § 17200. In its order on defendants' motion to dismiss, the court sustained the first three causes of action and dismissed Realtek's unfair competition claim. Order Granting in Part and Denying in Part Mot. to Dismiss ("MTD Order"), Dkt. No. 41.

Realtek now moves for partial summary judgment on the breach of contract claim and for an order enjoining defendants' from enforcing any exclusion order or injunctive relief with respect to the declared IEEE 802.11 standard-essential patents. Defendants cross-move for an order staying this case pending the resolution of the ITC action. For the purposes of these motions, the reasonableness of defendants' June 20, 2012 post-litigation license proposal is not at issue. Rather the issue is limited to whether defendants' initiation of the ITC Section 337 action naming Realtek as a respondent *before* offering a RAND license to Realtek is a *per se* breach of defendants' obligation to license its declared IEEE 802.11 standard-essential patents on RAND terms.

## II. PARTIES' ARGUMENTS

### A. Realtek's Motion for Partial Summary Judgment for Breach of Contract

Realtek argues that partial summary judgment for breach of contract is appropriate because: (1) LSI entered into enforceable contracts with the IEEE to license its declared standard-essential patents on RAND terms; (2) Realtek is a third party beneficiary to the contract; (3) LSI breached the contract as a matter of law by failing to satisfy its RAND obligations *before* seeking an exclusion order and injunctive relief before the ITC; and (4) Realtek suffered damage as a result of the breach. According to Realtek, "[i]n the context of letters of assurance to standards setting bodies, numerous other courts have found viable breach of contract claims based on the promisor's obligation to offer RAND licenses." Pl.'s Mot. 12 (citing *Microsoft Corp. v. Motorola, Inc.*, 854 F. Supp. 2d 993, 1002 (W.D. Wash. 2012), *Apple Inc. v. Motorola Mobility, Inc.*, 2011 WL 7324582, at *8-10 (W.D. Wis. June 7, 2011), *Research in Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788, 797 (N.D. Tex. 2008) and *ESS Tech, Inc. v. PC-Tel, Inc.*, 1999 WL 33520483, at *4 (N.D. Cal. Nov. 4, 1999)). Moreover, plaintiffs contend that, "for RAND-encumbered patents, injunctive relief such as an exclusion order may not be an appropriate remedy ***at any time***." Pl.'s Mot. 14 (citing *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 885 (9th Cir. 2012), *Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 914 (N.D. Ill. 2012) and *Microsoft Corp. v. Motorola, Inc.*, 2012 WL 5993202, at *7-8 (W.D. Wash. Nov. 30, 2012)). Realtek argues that LSI's June 20, 2012 post-litigation "RAND" license proposal does not satisfy defendants' promise to the IEEE to license on RAND terms because "making a proposal while simultaneously seeking an exclusion order is inherently inconsistent with a patent holder's RAND obligations." Pl.'s Br. 16, Dkt. No. 67.

In light of its position, Realtek seeks an order enjoining defendants from enforcing any exclusion order or injunctive relief that the ITC may provide until *after* a RAND license offer has been determined by this court. Realtek asserts that an injunction is proper because: (1) it may permanently lose customers if defendants obtain an exclusion order before the RAND licensing issues are tried in this case; and (2) defendants have an adequate remedy without the threat of an exclusion order, namely a reasonable royalty.[3]

[3] Realtek asks the court to take judicial notice of three documents: (1) a January 8, 2013 Joint Policy Statement issued by the U.S. Department of Justice and the U.S. Patent & Trademark Office; (2) the

Defendants counter that Realtek's motion for partial summary judgment is premature because it still needs deposition testimony from Realtek's designated witnesses to properly respond to the motion. For example, defendants assert that they need information regarding, *inter alia*, Realtek's willingness to accept a RAND license and Realtek's existing licenses, specifically to any patents essential to the 802.11 standard. Defendants contend that, because it is premature, the court should deny or continue Realtek's motion for summary judgment under Federal Rule of Civil Procedure ("Rule") 56(d), and instead grant its motion to stay.

**B. Defendants' Motion to Stay**

Defendants argue that because Realtek is asserting that defendants breached their RAND obligation as an affirmative defense in the ITC action, this court should exercise its discretion to stay this case pending the ITC's resolution of the issue. In support of their position, defendants argue that: (1) according to defendants' interpretation of Realtek's response to their request for admission ("RFA"), Realtek would not accept any RAND license determined by this court in any event until *after* the ITC investigation is complete and its noninfringement and invalidity contentions have been resolved in that forum; and (2) a stay of this action would cause no harm to Realtek because the only harm Realtek can point to is future harm *if* the ITC enters an exclusion order.

Realtek counters that a stay is inappropriate because the ITC proceeding involves entirely different claims and remedies. Realtek contends that the ITC proceeding is primarily dedicated to resolving infringement and invalidity issues, not the RAND licensing issue, whereas here, all three remaining claims relate specifically to defendants' alleged breach of their RAND obligations. Realtek also points to the fact that no damages are sought or available in the ITC proceeding (the sole relief to Realtek would be a finding of no violation of Section 337 and no exclusion order), and that Realtek does not actually seek a determination of the RAND rate itself in the ITC proceeding,

---

January 3, 2013 Opening Remarks of the U.S. Federal Trade Commission ("FTC") Chairman Jon Leibowits as Prepared for Delivery in *In the Matter of Motorola Mobility LLC and Google Inc.*, FTC File No. 121-0120; and (3) the January 3, 2012 Decision and Order of the FTC in *In the Matter of Motorola Mobility LLC and Google Inc.* The court considers these documents as part of the record but need not judicially notice these documents. *See, e.g.*, Jones v. Tozzi, 2006 WL 355175, *1 n.1 (E.D. Cal. Feb. 15 2006) ("It is not necessary for the court to take judicial notice of published judicial decisions or of documents that are part of the record of this case. Plaintiff may simply cite to these sources in his legal papers.").

**United States District Court**
For the Northern District of California

which it does seek here. According to Realtek, although there is some overlap, the RAND-related documentary evidence in this case is substantially different and more extensive than that before the ITC, and the witnesses are not all the same. Finally, Realtek asserts that: (1) contrary to defendants' interpretation of its RFA response, it *is* a willing RAND licensee, as long as it can preserve its right to appeal and to maintain its invalidity and noninfringement defenses before the ITC; (2) it may simultaneously pursue a determination of the RAND rate in this court while denying infringement before the ITC, *see* MTD Order at 7; and (3) there is no reason for this court to wait before determining the RAND royalty rate.

## III. ANALYSIS

### A. Breach of Contract

There is no dispute in this case that defendants entered into a binding contract with the IEEE to license their declared standard-essential patents, including the '958 and '867 patents, on RAND terms, and that Realtek is a third party beneficiary to that contract. The only question is whether defendants, by instigating an ITC Section 337 action naming Realtek as a respondent *prior to* offering a RAND license to Realtek, violated their contractual obligations to the IEEE and to Realtek to license their standard-essential patents under RAND terms. The court concludes that they did. This holding is consistent with the Ninth Circuit's recent decision in *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872 (9th Cir. 2012).

#### 1. *Microsoft v. Motorola*

In *Microsoft v. Motorola*, Motorola (the declared standard-essential patent holder) sent Microsoft an offer to license certain of its declared standard-essential patents. *Id.* at 877. Microsoft, believing that the offer was unreasonable, instigated a breach of contract action in the U.S. District Court for the Western District of Washington alleging that Microsoft's unreasonable offer was a *per se* breach of its RAND obligations. *Id.* at 878. Meanwhile, Motorola sought an injunction in Germany to bar Microsoft from selling the allegedly infringing products in Germany. *Id.* at 879. Microsoft then moved the district court for a temporary restraining order ("TRO") and preliminary injunction to enjoin Motorola from enforcing any injunctive relief it might receive from the German court until the district court ruled on the RAND issues. *Id.* at 880.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

First, the district court held that Motorola entered into binding contractual commitments to the IEEE and International Telecommunications Union ("ITU") and to Microsoft (as a third-party beneficiary to the contract) to license its declared essential patents on RAND terms and must do so, but denied summary judgment on the issue of whether Motorola's allegedly unreasonable offer letters were a *per se* breach of its RAND obligations. *Id.* at 878-79. Second, the district court issued an anti-suit injunction barring Motorola from "'enforcing any injunctive relief it may receive in the German Action.'" *Id.* at 880 (citing the district court order of May 14, 2012, Case No. 10-1823, Dkt. No. 318 (W.D. Wash.)). The district court held that the anti-suit injunction would "'remain in effect until [the district court] is able to determine whether injunctive relief is an appropriate remedy for Motorola to seek with respect to Microsoft's alleged infringement of Motorola's standard-essential patents.'" *Id.*

Motorola appealed the anti-suit injunction to the Ninth Circuit, and the circuit court affirmed under an abuse of discretion standard. *Id.* at 885. In so affirming, the district court first upheld "[t]he district court's conclusions that Motorola's RAND declarations to the ITU created a contract enforceable by Microsoft as a third-party beneficiary . . . , and that this contract governs in some way what actions Motorola may take to enforce its ITU standard-essential patents (including the patents at issue in the German suit)" were not legally erroneous. *Id.* at 884. The circuit court explained that "Motorola, in its declaration to the ITU, promised to 'grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to use the patented material necessary' to practice the ITU standards" and "*implicit in such a sweeping promise is, at least arguably, a guarantee that the patent-holder will not take steps to keep would be users from using the patented material, such as seeking an injunction, but will instead proffer licenses consistent with the commitment made*." *Id.* (emphasis added). The Ninth Circuit then affirmed the anti-suit injunction, holding: "[T]he district court did not abuse its discretion in determining that Microsoft's contract-based claims, including its claim that the RAND commitment precludes injunctive relief, would, if decided in favor of Microsoft, determine the propriety of the enforcement by Motorola of the injunctive relief obtained in Germany." *Id.* at 885. The circuit court further stated that "even if Motorola did not breach its contract, . . . *injunctive*

*relief against infringement is arguably a remedy inconsistent with the licensing commitment*." *Id.* (emphasis added).

In November 2012, the district court finally determined that any form of injunctive relief was improper because, in light of its commitment to license on F/RAND terms, "Motorola has not shown it has suffered an irreparable injury or that remedies available at law are inadequate." *Microsoft, Corp. v. Motorola, Inc.*, 2012 WL 5993202, at *7-8 (W.D. Wash. Nov. 30, 2012). This decision "enjoin[ed] Motorola from seeking injunctive relief against Microsoft with respect to Motorola's [relevant] standard essential patent portfolios," which included the German patents and obviated the need for the anti-suit injunction. *Id.* at 8.

**2. Application**

Similar to the situation in *Motorola*, here, defendants' are contractually obligated under their Letters of Assurance to the IEEE to license the '958 and '867 patents on RAND terms and Realtek is a third-party beneficiary to that contract (this is not disputed). Also, like in *Motorola*, the act of seeking injunctive relief (here, at the ITC *before* proposing a RAND license to Realtek) is inherently inconsistent and a breach of defendants' promise to license the patents on RAND terms. *See Microsoft*, 696 F.3d at 884-85; *Microsoft*, 2012 WL 5993202, at *7-8; *Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 913-14 (N.D. Ill. 2012) (Posner, J.) ("To begin with Motorola's injunction claim, I don't see how, given FRAND, I would be justified in enjoining Apple from infringing the [designated standard-essential patent] unless Apple refuses to pay a royalty that meets the FRAND requirement.").[4] Defendants' conduct in this case (bringing the ITC action *before* offering a license) is even more glaringly inconsistent with its RAND obligations than Motorola's request for an injunction at the district court *after* offering a license to Microsoft in the *Motorola* case. In promising to license on RAND terms, defendants here admit that monetary damages, namely a

[4] LSI actually took a position in ITC Investigation No. 337-TA-753 (initiated by Rambus, Inc.) that is consistent with *Realtek's* position here. In that action, Rambus made promises to European antitrust officials that it would accept royalties for the use of the patents at issue, but later sought an exclusion order naming LSI as a respondent. There, LSI argued that "injunctive relief is antithetical to [Rambus'] promises." Decl., Ex. Q at 132, Dkt. No. 67-19 (Respondents' Brief in ITC Inv. No. 337-TA-753). In view of LSI's binding promises to the IEEE to license the '958 and '867 patents on RAND terms, it is hypocritical for defendants to take the opposite position here—i.e., that injunctive relief is consistent with its patent right to exclude—now that it is on the other side of the coin as the declared standard-essential patent holder.

United States District Court
For the Northern District of California

RAND royalty, would be adequate compensation for any injury it has suffered as a result of Realtek's allegedly infringing conduct. *See Microsoft*, 2012 WL 5993202, at *7-8. Moreover, Realtek is harmed as a result of the breach because the pending threat of an exclusion order gives defendants inherent bargaining power in any RAND licensing negotiation that may now take place. *See* U.S. Dept. of Justice and U.S. Patent & Trademark Office, Joint Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments at 6 (Jan. 8 2013), Dkt. No. 68-1 ("Joint Policy Statement") ("A decision maker could conclude that the holder of a F/RAND-encumbered, standards-essential patent had attempted to use an exclusion order to pressure an implementer of a standard to accept more onerous licensing terms than the patent holder would be entitled to receive consistent with the F/RAND commitment—in essence concluding that the patent holder had sought to reclaim some of its enhanced market power . . . ."); *see also* Opening Remarks of Federal Trade Commission ("FTC") Chairman Jon Leibowits as Prepared for Delivery in *In the Matter of Motorola Mobility LLC, a limited liability company, and Google, Inc., a corporation* at 3, FTC File No. 121-0120 (Jan. 3, 2013) ("FTC's Opening Remarks"), Dkt. No. 68-2 ("[C]ommitments to make patents available on reasonable terms matter, and . . . companies cannot make those commitments when it suits them—that is, to have their patents included in a standard and then behave opportunistically later, once the standard is in place and those relying on it are vulnerable to extortion.").

While an injunction may be warranted where an accused infringer of a standard-essential patent outright *refuses* to accept a RAND license, *see Apple*, 869 F. Supp. 2d at 913-14; Joint Policy Statement at 7 ("For example, if a putative licensee refuses to pay what has been determined to be a F/RAND royalty, or refuses to engage in a negotiation to determine F/RAND terms, an exclusion order could be appropriate."), contrary to defendants' assertion here, there is no indication that Realtek is *not* willing to accept a RAND license. In fact, Realtek admits that it would accept a RAND license, as long as it may preserve its rights to appeal and to maintain its defenses at the ITC, the venue in which *defendants* elected to pursue their infringement claims. This court already determined that "Realtek can simultaneously pursue a determination of the RAND royalty rate while denying infringement or asserting invalidity, even though those issues may ultimately obviate the

need for a license" and that there is no reason the RAND royalty rate cannot be determined first. MTD Order at 7.

Defendants make no meaningful argument that they offered a RAND license to Realtek prior to naming Realtek in the ITC action. The 2002 and 2003 correspondences regarding the IEEE 802.11b standard do not amount to a RAND offer for a variety of reasons, including that: (1) the 802.11b standard is neither the standard at issue in the ITC litigation nor is it the subject of the RAND commitments in Agere's Letters of Assurance to the IEEE in the record before the court; (2) the parties ceased communications before any specific offer was ever actually made; and (3) Realtek continued to sell its Wi-Fi/802.11 component parts for almost nine years thereafter without hearing from defendants, implying that defendants were no longer seeking to license their declared standard-essential patents to Realtek. Moreover, LSI's March 7, 2012 letter did not offer a license, but rather asked Realtek to immediately cease and desist from the allegedly infringing activities. Instead of offering a license, or even waiting for a response, defendants filed the ITC action naming Realtek as a respondent less than a week later.

Accordingly, the court holds that defendants breached their contractual obligations to IEEE and to Realtek as a third-party beneficiary of that contract by seeking injunctive relief against Realtek before offering Realtek a license. The court's breach of contract holding is limited to the situation here, where defendants did not even attempt to offer a license, on "RAND" terms or otherwise, until after seeking injunctive relief. This conduct is a clear attempt to gain leverage in future licensing negotiations and is improper. The court denies defendants' motion for a Rule 56(d) stay or continuance because the additional discovery defendants seek is only pertinent to this court's *later* determination of an appropriate RAND rate, and does not affect the court's decision on the limited issue here of whether the initiation of the ITC action *before offering any license* was a breach of defendants' RAND obligations.

**3. Realtek's request for a preliminary injunction**

Realtek requests an order enjoining defendants' from enforcing any exclusion order or injunctive relief that they might receive until after the RAND issues have been determined in this

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

case.[5] Defendants argue that a preliminary injunction is improper because Realtek is not currently suffering irreparable harm, and can only point to speculative, future harm in the event that the ITC were to issue an exclusion order.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit has "also articulated an alternate formulation of the *Winter* test, under which 'serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest.'" *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). The court applies the *Winter* test here because Realtek has already established a likelihood of success on the merits.

*a. Likelihood of success on the merits.*

The court has already determined that defendant's act of seeking an exclusion order or injunctive relief by the ITC is inconsistent with defendants' RAND obligations at this time. *See* Part III.A.2 *supra*. Unless and until Realtek were to refuse a license under the court's-determined RAND terms (which Realtek indicates it will *not* do), then any exclusion order or injunctive relief is inconsistent with defendants' RAND obligations.

*b. Likelihood of irreparable harm*

Realtek has shown that the threat of an exclusion order has harmed its reputation and poses an imminent threat of customer and revenue loss. The record shows that at least two of Realtek's major customers have contacted Realtek to express concerns about the pending ITC action. *See*

[5] Realtek characterizes this request as a motion for summary judgment—and not a request for a preliminary injunction— but because the relief that Realtek seeks is, in fact, a preliminary injunction, the court characterizes and analyzes Realtek's request as a request for a preliminary injunction. Contrary to defendants' assertion, the court considers Realtek's motion to be timely under the circumstances because Realtek brought the motion soon after one of its major customers contacted it with concerns about the ITC litigation and at the time that Realtek apparently faced the threat of irreparable harm.

Daire Decl. Ex. U, Dkt. No. 67-23 (Chiang Ho Tsai Deposition discussing communications with customer); Tsai Decl., Ex. A (Dkt. No. 67-25) (letter from customer to Realtek expressing concern). The risk that Realtek loses its customers to competitors who are not faced with the threat of an exclusion order is more than speculative. Moreover, defendants do not dispute in their opposition papers to Realtek's motion for partial summary judgment that Realtek *would* suffer irreparable harm in the event that Realtek's products practicing the 802.11 standard were subject to an exclusion order. *See* Defs.' Opp'n 10, Dkt. No. 77. Thus, Realtek has demonstrated a likelihood of irreparable harm.

*c. Balancing of equities*

The court concludes that the balancing of equities also weighs in favor of a preliminary injunction. If Realtek's products practicing the 802.11 standard were to be excluded from the United States, Realtek would either (1) lose its customers who sell, use, or import Realtek's component parts into the United States, or (2) be forced to negotiate a license in the disadvantaged position of having an exclusion order hanging over its head. *See Microsoft v. Motorola*, Case No. 10-1823, Dkt. No. 318 (W.D. Wisconsin), May 14, 2012 Order Granting an Anti-Suit Injunction at 24 (applying the same analysis under this factor). Defendants are not similarly prejudiced by a preliminary injunction. After this court has determined defendants' RAND obligations and defendants have complied with those obligations, defendants may then pursue any injunctive relief that may become appropriate at that time. *See id.*

*d. Public interest*

Finally, the preliminary injunction serves the public interest by "mak[ing] clear that commitments to make patents available on reasonable terms matter." FTC's Opening Remarks at 3. Similar to the anti-suit injunction in the *Microsoft v. Motorola* case, the preliminary injunction here "ensur[es] standard essential patents are accessible to all comers under RAND terms" and "permit[s] [Realtek's] customers, who rely on [Realtek's Wi-Fi component parts], to conduct business uninterrupted." *Microsoft v. Motorola*, Case No. 10-1823, Dkt. No. 318 (W.D. Wisconsin), May 14, 2012 Order Granting an Anti-Suit Injunction at 24. The fact that *Microsoft v. Motorola* dealt with an anti-suit injunction is immaterial because the promise to license on RAND terms implies a

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

promise not to seek injunctive relief either domestically (as is the case here) or abroad (the case in *Motorola*) until the standard essential patent holder first satisfies its RAND obligations.

*e. Conclusion on preliminary injunction*

Based on the foregoing, the court GRANTS Realtek's motion for a preliminary injunction enjoining defendants' from enforcing any exclusion order or injunctive relief by the ITC that they might obtain against Realtek with respect to the '958 and '867 declared standard essential patents.[6] The preliminary injunction shall remain in effect until this court determines defendant's RAND obligations and defendants have complied therewith.

**B. Stay**

Defendants' primary argument in support of its motion to stay is that Realtek will not accept a RAND license in any event until after the ITC litigation concludes. As previously discussed, however, Realtek admits that it *is* a willing RAND licensee, as long as it can preserve its right to appeal and to maintain its invalidity and noninfringement defenses before the ITC, and this court has already held that Realtek may simultaneously pursue a determination of the RAND rate in this court while denying infringement before the ITC. MTD Order at 7. The court also agrees with Realtek that its breach of contract affirmative defense before the ITC is substantially different in nature than its affirmative breach of contract claim before this court. While the ITC may consider defendants' RAND obligations or violation thereof, it may do so only in the context of deciding whether Realtek violated Section 337 and whether an exclusion order is thus proper. Realtek has not asked the ITC to determine a RAND royalty rate, nor is the ITC independently compelled to do so. Unlike the ITC, this court may also order any *monetary relief* that may be warranted in light of its determination of the RAND issues. Defendants' conduct in bringing the Section 337 action, which carries with it the threat of an exclusion order and thus increases defendants' bargaining power in a licensing negotiation, necessitates a speedy resolution of the RAND issues by this court. The court finds no just reason to delay this determination and denies defendants' motion to stay.

[6] This preliminary injunction will only go into effect in the event that the ITC grants an exclusion order or injunctive relief in favor of defendants. The ITC may, of course, still analyze Realtek's claims and defenses independently, and may find no Section 337 violation in any event. In that instance, this preliminary injunction will become moot.

Case: 14-16319, 12/04/2015, ID: 9781052, DktEntry: 18, Page 91 of 92

## IV. ORDER

For the foregoing reasons, the court: (1) GRANTS Realtek's partial motion for summary judgment that defendants breached their RAND licensing obligations to Realtek by failing to offer a license to the declared standard essential '958 and '867 patents before filing a Section 337 action at the ITC seeking an exclusion order and injunctive relief; (2) GRANTS Realtek's request for a preliminary injunction barring defendants from enforcing any exclusion order or injunctive relief by the ITC, which shall remain in effect until this court has determined defendants' RAND obligations and defendants have complied therewith; and (3) DENIES defendants' motion for a stay.

Dated: May 20, 2013

RONALD M. WHYTE
United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that on February 4, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

  s/  Kirstin E. Largent